## Urias v. Pennsylvania R. R. Co., Appellant.

[Marked to be reported.]

*Negligence—Railroads—" Stop, look and listen."—Evidence.*

Where there is a doubt as to the proper place to stop, look and listen before crossing a railroad track, the question will as a general rule be referred to the jury; but where there is no such doubt, and it appears that the person injured stopped at a point where he could not see, it is for the court to determine whether the point was a proper place to stop.

If a person in approaching a railroad track could have had an unobstructed view of the track for nineteen hundred and fifty feet, if he had stopped and looked at a point eighteen feet from the crossing, and he goes upon the track, and is injured, it is in vain for him to say that he stopped, looked and listened at the point of unobstructed view.

*Evidence—Positive and negative—Ringing of bell—Instructions.*

Where there is conflicting testimony as to whether a bell was rung or not. before a train approached a grade crossing, the court should pointedly call the attention of the jury to the difference between positive and negative testimony upon a question of this kind.

One witness who hears the ringing of a bell is worth more than the testimony of a dozen witnesses who did not hear it, unless in some manner their attention had been especially called to it. The witness who heard the bell either tells the truth, or he tells a deliberate and willful falsehood, while the witness who did not hear the bell may be and is probably truthful. The bell may be rung or the whistle blown without attracting the attention of persons who are familiar with such sounds. Per PAXSON, C. J.

Argued Nov. 8, 1892. Appeal, No. 259, Oct. T., 1892, by defendant, from judgment of C. P. No. 3, Allegheny Co., Feb. T., 1892, No. 262, on verdict for plaintiff, Mary E. Urias. Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Trespass for death of plaintiff's husband.

At the trial, before KENNEDY, P. J., it appeared that plaintiff's intestate was killed on July 20, 1891, by being struck by a train of cars on defendant's railroad at a grade crossing at

Copeland station. The facts appear by the opinion of the Supreme Court. Defendant's request for binding instructions was refused. [1]

Verdict and judgment for plaintiff for $2,500. Defendant appealed.

*Error assigned* was, (1) instruction, quoting it.

*George B. Gordon, William Scott* with him, for appellant.— Urias stopped where he had no view, while the law requires that he must stop where he can see: Central R. R. of N. J. v. Feller, 84 Pa. 226; P. &. R. R. R. v. Carr, 99 Pa. 510; P. R. R. v. Beale, 73 Pa. 509.

Urias could not have failed to see this train had he used his eyes. One who is struck by a moving train which was plainly visible from the point he occupied when it became his duty to stop, look and listen must be conclusively presumed to have disregarded that rule of law and of common prudence, and to have gone negligently into an obvious danger: Myers v. B. & O. R. R., 150 Pa. 386; Carroll v. P. R. R., 2 Penny. 159; s. c., 12 W. N. 348; Moore v. P. W. & B. R. R., 108 Pa. 353; Morgan v. Camden & Atlantic R. R., 23 W. N. 189; P. R. R. v. Bell, 122 Pa. 58; Marland v. Pittsburgh & Lake Erie R. R. Co., 123 Pa. 487.

*R. E. Stewart*, for appellee.—There was evidence to warrant a verdict against the defendant for negligence on two grounds: (1) Because of the dangerous speed at which the train which caused the accident was run in the absence of any watchman or guard of any kind at the crossing where the accident occurred. (2) Because due and timely warning was not given of the approach of the train to the crossing at the time of the accident.

The place where Mr. Urias stopped was the best, if not the only available place that could have been chosen under the circumstances. But whether it was the best place or not was at all events a question for the jury: Ellis v. Lake Shore etc. R. R.; 138 Pa. 506.

OPINION BY MR. CHIEF JUSTICE PAXSON, January 3, 1893:

The only specification is, that the court below erred in refusing defendant's sixth point. The point was as follows: "That under all the evidence in this case the verdict should be in favor of the defendant."

The alleged negligence of the defendant was of a twofold character. First, that the train was running at an unreasonable rate of speed, and, second, that no warning was given by the blowing of the whistle, or the ringing of the bell, of the approach of the train to the crossing where the accident occurred.

The train appeared to have been running at a rate of from forty to forty-five miles an hour. The witnesses for the plaintiff testify that it was running at a high rate of speed without fixing the rate. This, perhaps, they could not do with anything like accuracy, owing to their want of experience in such matters. The defendant's witnesses, who are perhaps better qualified, fix the rate at from forty to forty-five miles, as before stated.

The testimony was conflicting, as is usual in such cases, in regard to the blowing of the whistle and the ringing of the bell. That, produced on the part of the plaintiff, was mostly negative in its character. It was in substance that they did not hear any such warning, though some of them say that they could have heard it if it had been given. On the part of the defendant at least as many witnesses testified positively that the whistle was blown at the proper place to give warning, and that the bell was rung. Some of these witnesses have no connection with the road, and, for anything that appears, were disinterested.

The difference between positive and negative testimony upon a question of this kind is very marked, and it would be well if the attention of jurors was more pointedly called to it by the court in the trial of such cases. One witness who hears the ringing of a bell is worth more than the testimony of a dozen witnesses who did not hear it, unless in some manner their attention had been especially called to it. The witness who heard the bell either tells the truth, or he tells a deliberate and willful falsehood, while the witness who did not hear the bell may be, and is probably truthful. The bell may be rung or the whistle blown without attracting the attention of persons who are familiar with such sounds. Several of the witnesses who were called on behalf of the plaintiff, and testified that they did not hear the warning, yet say that they distinctly heard the short, shrill signal of the danger whistle. I have no doubt they were entirely truthful in what they said. The reason they heard the one and not the other is easily reconcilable with com

mon experience.  The long whistle, which is used in approach-
ing a station, is so common upon a leading railroad line that
persons living in the vicinity, and especially near a crossing,
may hear it many times during the course of the day.  It is so
frequent that they may not notice it.   It conveys no meaning
beyond the fact that a train is approaching a station or a cross-
ing, but when the shrill warning signal is given by two or more
sharp blasts it is likely to attract the attention of persons in the
vicinity.   It is known to mean immediate danger to some one.
Thus we learn from plaintiff's testimony that the danger signal,
given just before the accident, attracted the immediate atten-
tion of those who did not hear the whistle or the bell at the
warning post.   They rushed immediately to the windows or
other points of observation to see what it meant.

We must assume under the finding of the jury that the train
was going at a high rate of speed.   We must also assume, how-
ever violent the assumption, that the whistle was not blown
nor the bell rung at the whistling post as they should have
been.   We must consider the case with the fact of the defend-
ant's negligence established by the verdict of the jury.

It remains to consider the question, whether the plaintiff was
guilty of contributory negligence.   As a general rule this ques-
tion must be submitted to the jury, but there is a line of cases
which it is unnecessary to cite that hold that where the facts
are not in dispute the court may rule this question as one of
law.

The undisputed facts in this case, as I gather them from
the evidence, and from the charge of the learned judge of the
court below, are as follows: On the 20th day of July, 1891,
Simon J. Urias, the husband of the plaintiff, with his one-
horse wagon drove up the road or street leading from the Mo-
nongahela river, or from that direction, up to the crossing of
the Pennsylvania Railroad at Copeland station, near Braddock
borough, in the county of Allegheny.   As he drove up the
road which was an ascending grade to the tracks of the Penn-
sylvania railroad, a freight train, going eastward from the city
of Pittsburgh towards Braddock, was passing in front of him on
the crossing, and he stopped on or near a switch or siding which
came out from the main track of the railroad a little to the east
of the crossing and ran into an ice house on the side of the de-

fendant company's road. The distance between the ice house and the south rail of the road was eighteen and a half feet. The deceased stopped with his wagon on or near this ice house switch or siding, and waited until the freight train had passed. As soon as the freight train had fairly cleared the crossing the deceased started to cross the track, when an express train of the defendant company came down the track from the direction of Pittsburgh, going in an eastwardly direction the same as the freight train had gone and struck his horse, knocking it loose from the wagon and carrying it some distance along the track and killing Mr. Urias.

After the freight train had passed, it is not disputed that the deceased looked up the track and discovering no approaching train attempted to cross the track, and his horse was struck almost immediately when it stepped upon the track. It is very clear that, from the point where the deceased stopped and looked, he could not see the approaching train for the reason that his view was obscured by the ice house. This appears from the testimony of his own witnesses, one of whom testified that: " He raised up first and looked towards Pittsburgh; of course, he couldn't see." If, on the other hand, it be contended that the deceased stopped at a point near the track, and where the ice house did not obstruct his view, he could have seen the train for a distance of nineteen hundred and fifty feet. For all that distance there was nothing to obstruct the view, and the evidence upon this point was not essentially contradicted. It is true, there was evidence that cars standing upon what is called the brick siding might obstruct the view to some extent. But there was no evidence that at the time of the accident there were any cars standing upon that siding. So that we have the case of a person who either stops and looks at a place where he cannot possibly see an approaching train, or who stops nearer the track where he could see a train more than a third of a mile away. If we adopt the latter view the case is ruled by Carroll v. The Railroad Company, 12 W. N. 348, where we said: " It is in vain for a man to say he has stopped, looked, and listened, if in despite of what his eyes and ears must have told him he walked directly in front of a moving locomotive." The same principle has been recognized in a number of subsequent cases, which it is unnecessary to cite.

On the other hand, if he stopped behind the ice house at a point where he admittedly could not see, it was not a compliance with the rule laid down in Railroad Company v. Beale, 73 Pa. 504. Where there is a doubt as to the proper place to stop, look and listen, as a general rule such question will be referred to the jury. But where there is no such doubt ; where the deceased stopped at a point where he could not see, it is for the court to determine whether it was a proper place. In Railroad Company v. Beale, supra, it was held that the failure to stop immediately before crossing a railroad track is negligence per se, and this is for the court, and that the rule is unbending.

Had the deceased complied with this rule he would not have been injured. There was room after he passed the ice house and before he reached the south bound track to have stopped where he could have seen the approaching train for a distance of over a third of a mile. As he approached the track his eye probably followed the retreating freight train instead of looking up the track for the approaching express train. It is clear, under the undisputed evidence, that had he done the latter he could have avoided the unfortunate accident which resulted in his death.

Judgment reversed.

See, also, the next case.