# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## William Holden *v.* Pennsylvania Railroad, Appellant.

[Marked to be reported.]

*Negligence—Railroads—Crossings—" Stop, look and listen."*

Where a collision takes place at the moment when a person, either on foot or in a carriage, goes upon a railroad track, he cannot recover, no matter what his testimony may be as to stopping, looking and listening, because the fact of the immediate collision conclusively proves that he did not exercise his senses as to the approaching train.

In an action to recover damages from a railroad company for personal injuries suffered by plaintiff, in consequence of a collision at a railroad crossing of a highway on which the plaintiff was riding in a carriage, it is the duty of the court to give binding instructions for the defendant where the only evidence that the carriage was stopped and plaintiff looked and listened, is the plaintiff's own testimony, which is flatly contradicted by the testimony of the driver of the carriage and by four other disinterested witnesses who saw the occurrence.

*Trial—Improper remarks of counsel—Withdrawal of juror.*

Where improper remarks of counsel are brought before the court by an affidavit in support of their verity, such affidavit becomes part of the record, upon the allowance of an exception and the refusal of the court to withdraw a juror, for the causes stated in the affidavit, may be assigned as error.

*Courts—Juries—Verdicts—Setting aside verdicts.*

When juries are so palpably regardless of their duty and of the sanctity of their oaths, that they permit their verdicts to be rendered in obedience to their prejudices or their sympathies, the trial court should deal with them in a firm and decisive manner, and should reject their erroneous verdicts

without the least hesitation and delay. Otherwise the administration of justice is brought into public contempt and dishonor.

Argued April 18, 1895. Appeal, No. 269, Jan. T., 1895, by defendant, from judgment of C. P. Luzerne Co., Oct. T., 1889, No. 1036, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ. Reversed.

Trespass to recover damages for personal injuries received by plaintiff at a railroad crossing of the highway on which plaintiff was riding in a carriage. Before LYNCH, P. J.

At the trial it appeared that on the morning of Aug. 31, 1888, Rev. William Holden, rector of St. Peter's church, Hazleton, accepted an invitation extended to him by Mrs. J. C. Hayden, one of his congregation, to ride in her phaeton, four or five miles into the country upon some business connected with the church. The horse was driven by Mrs. Hayden. The accident occurred at a grade crossing, known as Cranberry crossing, about three quarters of a mile from Hazleton. Plaintiff testified that, before they went upon the tracks, the carriage was stopped, and he looked and listened for an approaching train. Mrs. Hayden testified that the carriage did not stop, and four witnesses who saw the occurrence corroborated her testimony. The testimony of the plaintiff, of Mrs. Hayden, and of the witnesses who saw the occurrence, is quoted at length in the opinion of the Supreme Court:

After John T. Lenahan, Esq., one of plaintiff's counsel had addressed the jury, and before the charge was begun, the following paper was presented to the court:

" The defendant respectfully requests the court to instruct the jury:

" 1. That counsel for the plaintiff misbehaved himself in stating to the jury, as follows: ' If ever corruption was resorted to in a case, this is the case.'

" That there is no evidence in the case showing or tending to show that corruption has been resorted to.

" 2. In stating to the jury that ' It ' (meaning the crossing) ' was a death-trap put there by these men ' (meaning the defendants) ' for the purpose of taking the lives of their fellowmen.'

" 3. In arguing to the jury that the crossing was dangerous

after agreeing to defendant's point that the duty of guarding the crossing belongs to the Lehigh Valley Railroad.

"4. In stating to the jury that 'only one, indeed, had an interest in having the barn disappear, that was the Pennsylvania Railroad. Its being taken down would damage but one person, one to be benefited. A body of men capable of taking the barn down were capable of fixing the foundations at any spot that would suit the purpose of the case.' There being no evidence that the defendant had in any way interfered with the barn or its foundations.

"5. In saying that the witness, 'Cahoon, is a fellow bumming around the town. The dollar he expects to get is the only dollar he has earned in many a year.' And in calling him a 'bummer.'

"6. In calling the company's detective a ghoul with a human face, but the heart of a beast.

"7. In saying that 'she' (Mary Matthews, meaning), 'was flayed by this ghoul in the newspapers.' Meaning detective Heffernan, when, in point of fact, there was no evidence of any such thing.

"8. In stating as follows: 'They' (the defendants, meaning) 'may bully the venal, but the day has come when they must cease the attempted system of terrorizing witnesses who swear against them,' in absence of evidence that any such thing has been done.

"9. In stating as follows: 'Hughes and Cahoon are lying with a hope of being paid for their dishonest and dastardly service. These two infamous perjurers should be avoided. It becomes your duty and mine to stamp those perjurers, as the tools of a company—They are infamous birds of prey.'

"10. In saying (the defendant's witnesses, meaning), 'These scoundrels that have gathered together shall not be successful until they have been scourged by the heavy hand of justice.'

"11. In abusing Mrs. J. C. Hayden, as appears in the notes taken by the stenographer.

　　　　　　"H. W. PALMER, Attorney for Defense.

"LUZERNE COUNTY, *ss.*

"H. W. Palmer, being duly sworn, saith, that the above extracts from the remarks of J. T. Lenahan, Esq., to the jury

in the above stated case are correct and were taken down at the time of their delivery, by deponent.

                    "H. W. PALMER."

"Sworn and subscribed before me, this 14th day of December, 1893.

                "J. C. WEGAND, Prothonotary.

                    "Per S. E. INNES."

Defendant's counsel upon presenting the above paper requested the court to withdraw a juror and continue the case, on the ground that the counsel for plaintiff had misbehaved himself. The court refused the request, and sealed a bill for defendant. [6]

The court charged in part as follows :

" It is not enough that the defendant be negligent and that such negligence caused the accident. If it be shown in this case that the plaintiff, Mr. Holden, was guilty of negligence, however slight, which contributed to the accident, he cannot recover. The law in this state is well settled, and has been for many years past, that a traveler upon a public highway who is about to cross a railroad must first stop (not slack up), look both ways, up and down the track, and listen for approaching danger. There is no exception to the rule. I speak now, of course, of a case of this character. If this were Mrs. Hayden's case, and she had testified, as she has here, that she did not stop, look or listen before crossing the track, she could not recover damages from the defendant. But this is not Mrs. Hayden's case, but the Rev. Mr. Holden's. Mr. Holden was her invited companion. The phaeton and horse, by which they were traveling, if you believe the evidence of Mrs. Hayden and there is nothing to contradict it, belonged to her. Mr. Holden was a passenger or a companion without hire. The conveyance was not that of a common carrier, it was private. Under such circumstances, if Mrs. Hayden had been guilty of the negligence of which she says she was guilty, by driving upon the railroad without stopping, and if the plaintiff in this case did not know or had not been informed at the top of the hill that there was a railroad crossing, the negligence of Mrs. Hayden would not defeat the action of Mr. Holden. In other words, it would then be the negligence of Mrs. Hayden and the railroad company, and Mr. Holden would upon proper proof have a right to re-

cover from either. But in this case it is in evidence that although Mr. Holden had not been upon the road before, he was informed at the top of the hill that there was a railroad crossing and that it was a bad place, and he was on the lookout for the approach of trains of cars.

"Under such circumstances (I am not speaking now of whether he did stop, look or listen at all), it was his duty to have either left the carriage or have it stopped. With such knowledge, being carried gratuitously by Mrs. Hayden, he was bound to see that the carriage was stopped before crossing the track. Did the plaintiff stop, look and listen at the time they were about to cross the railroad track? The court instructs you that the stop at the top of the hill, nearly 300 feet from the crossing, was not sufficient. The stop must be at a time when they are about to cross. The evidence of the plaintiff is, substantially, that they stopped first at the top of the hill, that they drove down the hill and to within about fifteen or eighteen feet of the railroad, and before attempting to cross the track Mrs. Hayden stopped the horse again and that he first looked to the right, that is, to the west, in the direction in which the train finally came, and having seen no danger or any train approaching from that direction, he looked to the left over the shoulder or back of Mrs. Hayden; that he saw nothing approaching upon the track from that side; that then something was said about all right, and that the horse was started. About the time the fore part of the horse was upon the track he felt the approach of impending danger, and the horse was struck by the locomotive.

"Did the plaintiff stop at or about that distance from the track? You have the evidence before you of several witnesses who testified that he did not, and Mrs. Hayden also testified that he did not stop. On the other side you have the positive evidence of the plaintiff that he did—that they did stop before crossing.

"[In so far as this branch of the case is concerned, if you shall determine that the conveyance was stopped at that place, that the plaintiff did look up and down the road, that he did listen for approaching train, heard none, saw none, heard no signal and that no signal was given, then he did his duty.] [1]

"It is contended by the defendant that even though the con-

veyance was stopped at that point, say in the neighborhood of fifteen or eighteen feet from the crossing, that still the plaintiff is not entitled to recover. That under the evidence in this case, if the conveyance was stopped at the point indicated, and that he did look to his right or west along the track, that he must necessarily have seen the approaching train. You will remember the calculations, figures and distances given by the different witnesses where a train could be seen, from that point, and also the alleged discrepancies and contradictions. If you shall determine, as a matter of fact, that the plaintiff did stop, look and listen at the point indicated, and that there was a plain unobstructed view of an approaching train for a long distance, then, as stated by the Supreme Court, he cannot deny that he saw what his eyes must have seen if he had looked, or what his ears must have heard if he listened."

Defendant's points were among others as follows:

" 5. It was the imperative duty of the plaintiff to stop, look and listen at the point at which he could see and hear, before crossing the track, and if the jury believe from the evidence that he did not do so, he cannot recover in this case. *Answer :* The point is affirmed, with this qualification, that if there was such a place, then it was his duty to stop, look and listen at that place. It is for the jury to say whether there was such a place or not. [2]

" 3. That under the circumstances of this case as, shown by the evidence, no presumption of negligence can arise from the rate of speed of the train. *Answer :* The point is negatived. [3]

" 4. That under the testimony of the plaintiff, he stopped to look and listen at a point where he must have seen and heard the approaching train, if he looked and listened at all, and therefore to advance upon the track was negligence on his part, and the plaintiff cannot recover. *Answer :* I decline to affirm the point. [4]

" 8. That under all the evidence in the case the verdict should be for the defendant. *Answer :* The point is refused." [5]

Verdict and judgment for plaintiff for $10,000. Defendant appealed.

*Errors assigned* were (1–5) above instructions, quoting them.

*H. W. Palmer*, *Wm. C. Price* with him, for appellant.— The charge was inadequate: Peirson v. Duncan, 162 Pa. 187 ; Penna. Land Co. v. Harris, 101 Pa. 80 ; Penn Iron Co. v. Diller, 17 W. N. C. 9.

The court should have withdrawn a juror and continued the case. Any misconduct of counsel in closing argument which tends to prejudice the minds of the jury, turn them away from a consideration of the true facts and mislead them into a verdict based upon assertions, and not evidence, is ground for withdrawing a juror.

It is vain for a man to say that he looked and listened, if, in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive: Penna. R. R. v. Bell, 122 Pa. 64 ; Carroll v. Penna. R. R., 12 W. N. C. 348 ; Marland v. Pittsburg & L. E. R. R., 123 Pa. 487 ; Moore v. R. R., 108 Pa. 349 ; Mooney v. R. R. Co., 26 Pa. 244 ; Aiken v. R. R. Co., 130 Pa. 380 ; Irey v. R. R., 132 Pa. 563 ; Kraus v. R. R., 139 Pa. 272 ; Hauser v. R. R., 147 Pa. 440 ; Ash v. R. R., 148 Pa. 133 ; Myers v. Railroad, 150 Pa. 386 ; Urias v. R. R., 152 Pa. 326 ; Newhard v. R. R., 153 Pa. 417 ; Lees v. R. R., 154 Pa. 46 ; Smith v. R. R., 160 Pa. 117.

*William Drayton*, *John T. Lenahan* and *Alex. Farnham* with him, for appellee.—The question as to the weight of the evidence was for the jury and for the court below: Sampson v. Com., 5 W. & S. 385 ; Shaffer v. Clark, 90 Pa. 94.

The jury are the exclusive judges of the credibility of the witnesses and the weight of their testimony : Shellabarger v. Nafus, 15 Kans. 547 ; Calvert v. Carpenter, 96 Ill. 63 ; Fort Wayne etc. R. R. v. Husselman, 65 Ind. 73 ; Reeve v. Dennett, 137 Mass. 315 ; Thatcher v. Traction Co., 166 Pa. 66 ; Iaquinta v. Citizens Traction Co., 166 Pa. 63 ; Goldstrohm v. Stinner, 155 Pa. 28 ; Ely v. R. R., 158 Pa. 233 ; Arnold v. R. R., 161 Pa. 1 ; Kohler v. R. R., 135 Pa. 357 ; R. R. v. Alvord, 128 Pa. 42 ; Keng v. B. & O. R. R., 160 Pa. 644 ; Baker v. Gas Co., 157 Pa. 593 ; R. R. v. Coon, 111 Pa. 430 ; Mitchell v. Mitchell, 18 W. N. C. 439.

A judgment will be affirmed, though the charge might give the impression to the jury that the defendant's evidence was more worthy of credit than that offered by the plaintiff : Grantz

v. Price, 130 Pa. 415; McKnight v. Matthews, 10 Cent. L. J. 287.

The court properly refused to withdraw a juror: Thompson v. Stevens, 71 Pa. 161 ; Fulmer v. Com., 97 Pa. 503 ; Com. v. Hanlon, 8 Phila. 423; Thompson on Trials, sec. 978 ; Thompson v. Barkley, 27 Pa. 263.

OPINION BY MR. JUSTICE GREEN, May 30, 1895 :

This was an action to recover damages for personal injuries suffered by the plaintiff in consequence of a collision which occurred at a railroad crossing of a highway on which the plaintiff was riding in a carriage. The plaintiff being examined as a witness on his own behalf, described the occurrence of the accident thus:

" We stopped at this place which was at the top of the hill and looked, and looking down we perceived, or at least I, speaking for myself, perceived a railroad track and at the time we stopped Mrs. Hayden made this remark—objected to. Q. What did you do then? A. We proceeded on our way. Q. Were you walking or driving? A. We were driving. Q. Who was driving? A. Mrs. J. C. Hayden had the reins. Q. Was it a double horse vehicle or one horse? A. No, sir, one horse. Q. Go right on now? A. We went down this hill and came to within fifteen or eighteen feet of the track which crossed the highway upon which we were going towards Mt. Pleasant, and at that distance we stopped and I, looking towards the right, to see if there were any indications of a railroad train or might be possibly one of those—I have forgotten the name of them—a loose car for the want of a better name— and looking toward the left, which would be over Mrs. J. C. Hayden, who sat on my left, I said to her, ' all right,' and we started; and the horse's head and seemingly his front feet got on the track, when, as it might be said, momentarily, something, instinct or otherwise, impressed me and my head turned about and I saw the train upon us. I then grabbed the reins from her hand and endeavored to pull the horse back to the best of my ability so as to avert the force of the blow. That was the incident so far as the accident was concerned. Where I lay after that I can scarcely tell at this moment but I know that there were persons about me. Dr. Furst came to me and

told me that my leg was broken. . . . Q. From the time you left the top of the hill what did you do on the way down from the hill down to the railroad? A. I was on the alert watching for the train. . . . Q. When you got to the barn what did you do this day? A. When we got to the barn, as I say, I was looking out on the alert to watch for any danger that might threaten me, and as we got beyond it or a little beyond it, we stopped, that is to say, Mrs. Hayden had the reins in her hand, she stopped the horse. Q. What did you do when you stopped the horse? A. I looked out toward my right and I saw a railroad track at a distance, right before me at the right was three houses, and there was a turn which ran around and came out again, as far as I could see was this track again. Q. When you got a little beyond the barn you stopped? A. Yes, sir. Q. And you looked? A. Yes, sir. Q. Did you listen? A. I did. Q. Which way did you look first? A. To my right, in the direction as I was sitting on the right side of the carriage. Q. Which way did the train eventually come from? A. It came from the right. Q. After looking to the right what did you do? A. I then looked to the left being compelled to reach over Mrs. Hayden who sat in a measure bending forward to see if there was anything from the left. Q. About how far were you from the railroad track when you stopped and looked and listened? A. About fifteen to eighteen feet, I should say. Q. What did you do after you looked to your left? You say you looked to your right and then to the left. What did you do then? A. I says to Mrs. Hayden, 'all right,' putting out my hand to intimate she should go ahead. Q. Did you see anything at all? A. I did not. Q. Did you hear any noise of a bell rung? A. No, sir, I did not. Q. You got on the track did you. A. That is to say the horse's head and front feet. Q. What was the first thing that called your attention to it? A. The first thing was a seeming intimation or sound it might be said of some approaching danger, one of those unexplainable things in human nature which might be said to warn a man, and I then grabbed the reins from Mrs. Hayden for the purpose of pulling the horse back, recalling at that moment a principle which—objected to—it was the principle which was stated by Umstead. Q. State what you did? A. I grabbed the reins and pulled the horse back as far as I

was able. Q. And what then? A. Then I was cast, so far as I can tell anything about being cast at all, with such a blow against the train, when the injury which I have received resulted. Q. State whether or not up to that time a bell had rung or a whistle had blown? A. Not to my knowledge, I didn't hear it."

On cross-examination he further testified: "Q. Mrs. Hayden drove the horse all the way from Hazleton down to the time when you were struck by the locomotive? A. Up to the time the engine came, when as I say I took the lines. Q. You took the lines out of her hands to pull the horse back off the track? A. Yes, sir. . . . . Q. You stopped fifteen or eighteen feet from the railroad? A. Yes, sir. Q. Your person or your body was fifteen or eighteen feet away and the horse was nearer the track than you were? A. Yes, sir. Q. The horse's head would have been six feet or something like that from the railroad? A. I should say probably it would have been more. Q. Six or eight feet? A. Yes, sir; probably eight or ten, somewhere in that vicinity. When I said fifteen to eighteen feet I mean generally. Q. When you looked you didn't see anything, and then the horse was started on? A. Yes, sir. Q. Did Mrs. Hayden start up the horse? A. Yes, sir. Q. She was driving? A. Yes, sir. Q. Well it didn't take the horse a great deal of time from the time he started until his fore feet were on the track? A. It seems to me a moment. Q. Momentarily? A. Yes, sir, it seemed to be. Q. The next instant you were struck? A. Yes, sir. Q. It was just about two moments from the time you started until you were struck? A. A moment, in the general sense I suppose in the term it is used. A very short time you may say. I looked to the right and saw this train upon me. . . . Q. You want to be distinctly understood as swearing that you stopped fifteen or eighteen feet away from that track and looked and listened, do you? A. I do, sir."

As Mrs. Hayden was a participant in the action which immediately preceded the accident, and as it was she who was really driving the horse at the time, it is necessary to recur to her testimony on the same subject, in order to intelligently consider the question involved.

After saying that the plaintiff was riding in her carriage by her

invitation, and that she was driving, she was asked: "Q. State whether you made any stop from the time you left Hazleton until you were struck by the locomotive? A. We did not make any stop at all from the time we left Hazleton; the lines were in my hand until Mr. Holden said, "My God! there is a locomotive"; we drove on the track and we were struck in the midst of the phaeton and the only stop we made was when we landed on the ground. Q. At what place did the locomotive strike the phaeton? A. On the side of the phaeton on Mr. Holden's side. Q. Did the horse go on one side and the carriage on the other? A. The horse went into a mine hole about forty feet the other side and was killed instantly and we went on the other side. . . . Q. It has been testified when you were within fifteen or eighteen feet of the track that the horse was stopped and that the plaintiff looked and listened for approaching trains, is that true? A. It is not, we never stopped at all; the lines were never out of my hand until he seized them, and that was before we had ever heard of stop, look and listen. I had never heard it was necessary to do that."

It is not necessary at this moment to consider the other testimony upon this subject. It is all in direct and absolute conflict with the plaintiff's testimony and will be considered hereafter in its proper connection.

It is only required now to say that upon the testimony of himself, and still more strongly upon the testimony of Mrs. Hayden, the case comes clearly within the line of cases in which we have long held that where the collision takes place at the moment when the party enters upon the track he cannot recover, no matter what his testimony may be as to stopping, looking and listening, because the fact of the immediate collision conclusively proves that he did not exercise his senses as to the approaching train. We first applied this rule to foot passengers in the familiar case of Carroll v. The Railroad Co., 12 W. N. C. 348, in which we said: "It is in vain for a man to say he has stopped, looked and listened, if in despite of what his eyes and ears must have told him he walked directly in front of a moving locomotive." We applied it in the cases of Penna. R. R. Co. v. Bell, 122 Pa. 64, and Marland v. Pitts. & Lake Erie R. R. Co., 123 Pa. 487, in both of which the parties injured were foot passengers and in a number of other cases since then.

In the Marland case we said, " On the trial of this case the plaintiff testified that he stepped upon the track and was instantly struck and injured. It is true he said he looked up and down the track; but it is necessarily true, also, that if he made use of his eyesight he must have seen the approaching train. He could not possibly look along the track in the direction of the approaching train and fail to see it since his presence on the track and the collision were simultaneous."

This language is precisely applicable to the plaintiff's testimony in the present case. He says he looked both ways on the track and listened and saw and heard nothing. Yet he says the moment the horse's head and front feet were upon the track the train was upon them and the collision occurred. Of course if he really exercised his eyesight he must have seen the approaching train. He could not possibly look along the track in the direction of the train and fail to see it since the presence of the horse on the track and the collision were simultaneous. He says he could see the track for 150 to 200 feet from the crossing, but the abundant and entirely uncontradicted testimony was that at the point from which he looked a locomotive approaching could be seen constantly for a distance of half a mile. Either distance was sufficient to warn him off the track if he had really used his eyes to see.

Of course the testimony of the lady who actually drove the horse is absolutely fatal to the plaintiff's claim, as she says they did not stop at all, nor look nor listen, but drove directly on the track.

Therefore either upon the testimony of the plaintiff or upon that of the lady there could be no recovery.

In the case of Myers v. B. & O. R. R. Co., 150 Pa. 386, the same doctrine was applied to a person attempting to cross the track in a wagon. Our brother WILLIAMS, delivering the opinion, said, " The plaintiff says he complied with the rule. At about fifteen or twenty feet from the track he says he stopped his team, looked each way along the railroad and listened; and that he neither saw nor heard a train approaching. He then drove on and while upon the track was struck and injured. If this is true he did all the rule requires, and all that was possible to be done. Is it true? This question the court below left to the jury, and they promptly found that it was true. . . . The

fact that four or five seconds after he says he looked and listened he was struck by a train that must have been plainly visible and almost on him at the time he alleges· he looked, is so palpably and absolutely irreconcilable with the truth of his statement that he did stop, look both ways, and listen, before driving upon the crossing, that it is trifling with justice to permit a jury to find that it is true.　Such a finding is absurd.　It is simply and flatly impossible that one can stop, look and listen for an approaching train that is in plain view and close at hand, and be unable to see or hear it, if he possesses the senses of sight and hearing."

In the case of Urias v. Penna. R. R. Co., 152 Pa. 326, the rule was again enforced against a person traveling in a wagon who was struck and killed the moment his horse stepped upon the track.　The previous decisions were recognized and reaffirmed.　There is no difference therefore in the application of the doctrine as between foot passengers and carriage passengers. In either case if the person injured testifies that he stopped and looked both ways and listened, and neither saw nor heard an approaching train, yet if in fact he is struck and injured the moment he or his horse gets upon the track, it is conclusive proof that he could not have used his senses, and he cannot recover.

In this particular case the evidence against the plaintiff's testimony in this regard is simply overwhelming, and it was the plain duty of the court below to have affirmed the defendant's eighth point, " That under all the evidence in the case the verdict should be for the defendant."

The plaintiff's testimony that he stopped, looked and listened, was not only not corroborated by the testimony of a single witness, but it was most positively contradicted by the testimony of every witness who was examined upon the subject.　Mrs. Hayden, who rode beside him in the carriage, and who was actually driving the horse herself, testified in the most emphatic and positive manner that there was no stopping, or looking or listening before driving on the track.

Mrs. Kress, a witness for the defendant, whose house was close to the highway and near the crossing, testified : " I was upstairs, cleaning upstairs and I heard the engine whistle, and I ran to the window to see if any of the children was on the

railroad. . . . I ran to the window and looked down the railroad, and I saw Miss Mary Ann Matthews, that drawed my attention first; she was going towards old Cranberry; she was on the railroad then. As I was watching her I saw this buggy coming down the road, I says, 'there's a train coming' and they seemed not to pay any attention to me and I called out again. Mrs. Spencer heard me and she came running to the steps and says 'Oh, my! what's the matter?' and I says, 'There's a train and there goes a buggy down and they will be caught.' Q. Were they caught? A. Yes, sir, they were. Q. State whether that buggy stopped from the time you first saw it until it was struck on the railroad? A. No, sir. Q. Where was the buggy when you first saw it? A. Right outside of my gate."

John Kress testified that he saw the carriage pass when he was standing at the gate, but that he paid no attention to it until he heard some one halloo, and on looking he saw the train strike the carriage. Q. Did you hear the train whistle? A. Yes, sir. Q. Could you tell where the train was when it whistled? A. No, sir, I didn't see at the present time. Q. You could not see it from where you were? A. No, sir; I didn't look to see it where I was standing, but they whistled, that is all."

Mrs. Renart testified, " I was with the child in my arms standing in the yard. There is the fence and then is my yard and there is the road, and I saw the buggy come with a lady and gentleman, and the gentleman was reading a paper and the lady was driving. They were talking a little bit, laughing and talking and laughing. And my boy was home, and I said to the boy, ' They will not hear the train whistling, they are talking,' and then I said ' Hey, hey,' and then I see Mrs. Kress running out the gate and she goes in the street hallooing, ' Hey, hey, the train,' that is what Mrs. Kress says, I heard that with my ears and I thought she can make the buggy stop and she did not. I saw they cannot stop and the train bell was ringing and I says, ' Michael, better run, they go to pieces.' It went bump and the horse on the other side of the train and I did not see the rest. I saw them going high, and the lady came flying down and I could not see who it was, and I was looking and I thought he was may be on the side with the horse. . . . Q. From the time you first saw the horse and wagon up to the time they were struck on the railroad, did the horse stop at all? A. No, sir, the horse did not stop."

Mrs. Spencer testified: "I was in the shanty ironing, and I heard Mrs. Kress's voice crying out. I was in the shanty ironing, and I heard Mrs. Kress cry out about some people's going down the way and she says, 'Oh, my God! they get killed,' and I ran out the shanty and I says, 'Who is it?' and she says, 'Somebody in the buggy.' And I jumped over Mrs. Kress's fence into the yard and went to the fence and shouted three different times, but they didn't take any notice, I don't suppose they heard—and I stopped at the fence awhile and I saw the train approach the buggy. I turned back again and sat on the steps. It was more than I could do. I could not go down to the railroad to see what was going on. Q. Whether you heard the train approach before that came? A. Yes, sir, I heard the train whistle and I heard the bell ringing when it was going on the railway below the house. Q. From the time you first saw this horse and buggy until they were struck did they stop at all? A. Not at all, sir."

Frank Renart testified: "Q. Was you present at the time this accident happened? A. Yes, sir. Q. Where was you at that time? A. The time they got struck with the engine I was in the house. I was just opening the door and went in, just as I was closing the door I heard that crack. Q. Did you see them before that time? A. Yes, sir, I saw them going down the road. Q. What were they doing, the man and woman in the wagon? A. They would be shouting and laughing like, not coming to their business at all, they wasn't coming down the way they ought to. If they had taken care of themselves, they never would have been struck. . . . Q. Where were you when you saw them first? A. On my own porch. Now the porch is taken away, part of it. Q. The porch of your house? A. Yes, sir, the old house. I noticed them come down to the corner of the upper fence, the upper corner of the lot, I took notice of their coming all the way down until they passed our house, and then I turned around and went in the door, and when I was just about in the door I heard the shock."

Samuel Spencer testified: "I was sitting on the back yard fence watching the engine coming in. Q. Whether or not you heard the whistle blow? A. I heard the whistle blow at the regular place where she always blowed when she came to the houses. I heard her ring the bell when she passed me. I looked

over and I saw the buggy between the stable and the—just coming from behind the stable. They didn't stop, and I kept watching them until I saw the engine go on top of them, and seen the horse on the right hand side of the road, and the buggy on the left hand; the buggy struck a telegraph pole and dropped down."

It became necessary to make the foregoing citations from the testimony because of the defendant's request for a binding instruction upon the whole of the testimony. In our opinion, this review of the evidence shows conclusively that the learned court below should have granted the instruction prayed for by the defendant's eighth point. There was no testimony in the cause that the plaintiff stopped, looked and listened before going upon the track, except the entirely unsupported and uncorroborated statement of the plaintiff himself. That statement was positively and flatly contradicted by the testimony of the lady who was driving the horse, and therefore had even a better opportunity of knowing the truth than the plaintiff, and who really testified against her own interest in making her statement. The testimony of the plaintiff was most profoundly affected by his personal interest in the result. The very fate of his cause depended upon his individual testimony, and as his claim for damages was very large, and the costs and expenses of the trial were necessarily considerable, it is not possible to conceive of a case in which the effect of a heavy pecuniary interest in the result could exercise a more powerful influence upon the mind of the witness, than this. As the review of the evidence shows, he stood entirely alone, not a solitary witness corroborated him in the least degree in this vital feature of his case, and of this fact he, being the plaintiff, was necessarily aware. We think the learned court below, in these circumstances, should have carefully explained to the jury the difference between interested and disinterested testimony, and should have specially cautioned them as to their duty in weighing and deciding upon a conflict of testimony in such a case. Nothing of this kind was done and we think the charge was not adequate in that regard.

But upon the effect of the whole of the evidence considering the positive contradictory testimony of Mrs. Hayden, and the equally positive and contradictory testimony of four other

witnesses, each of whom had equal opportunity of observation, and all of whom were totally disinterested, and every one of whom testified positively that the horse and buggy were not stopped before going on the track, it was the clear duty of the learned court below to direct the jury to render a verdict for the defendant. Both upon our now well established rule that, even where the plaintiff does testify, that he stopped, looked and listened, and neither saw nor heard, an approaching train, and yet it struck him the moment he got upon the track, he cannot recover; and also upon the consideration that the plaintiff's testimony was most deeply interested, that he stood alone and was positively contradicted by the oaths of five disinterested, competent, unimpeached witnesses, all of whom had equally good opportunities of observation with the plaintiff, and upon the further consideration that the court could not properly sustain an adverse verdict, it was the clear duty of the trial court to direct a verdict for the defendant. The accomplished and distinguished jurist who tried the case the first time it was heard, was dissatisfied with the verdict for the plaintiff, and in a very able and exhaustive opinion he declared that the verdict was against the weight of the evidence and accordingly set it aside and granted a new trial. The second verdict was manifestly against the law and the evidence and should have been promptly set aside by the learned court below. When juries are so palpably regardless of their duty, and of the sanctity of their oaths, that they permit their verdicts to be rendered in obedience to their prejudices or their sympathies, as is too often the case, the trial courts should deal with them in a firm and decisive manner and should reject their erroneous verdicts without the least hesitation or delay. Otherwise the administration of justice is brought into public contempt and dishonor.

We think the sixth assignment of error is sustained. The matters therein complained of were brought before the court by an affidavit in support of their verity, the court entertained the application which was made by the appellant for the withdrawal of a juror for the causes stated, and refused it, and thereupon sealed a bill of exceptions at the instance of the appellant. The application was promptly made at the conclusion of the argument by counsel for the appellee and before the court commenced charging the jury.

The written application for instructions to the jury on account of the language used by counsel for the appellee in his closing argument, was filed, the requests were refused, and upon a bill being sealed the paper and the action of the court thereon, became a part of the record and the subject of an assignment of error. In Commonwealth v. Weber, 36 W. N. C. 193, not elsewhere reported, this subject was carefully considered in the opinion of this court by our brother DEAN, and it was there held that if such matters as the foregoing were upon the record, they could be considered by us upon error assigned. A somewhat different method of getting the matter on record was indicated but not to the exclusion of such other methods as would accomplish the same result.

The matter being before us in this case in a legitimate manner, we are bound to say we consider the assignment well taken. The comments of counsel complained of were of the most offensive and reprehensible character, not sustained by any evidence in the cause and justly deserving the severe censure of the court. We can discover nothing to palliate them in the least degree, and inasmuch as there was no other efficacious remedy available to correct the mischief done, it was the plain duty of the court to withdraw a juror and continue the cause. Many judges are in the habit of doing this upon proper occasion, and that practice deserves to be widely extended, so that counsel who indulge in the habit of making such comments, may be properly admonished that they cannot do so except at severe cost to their clients and themselves.

The assignments of error are all sustained.

Judgment reversed.