# CASES

IN THE

# SUPERIOR COURT

OF

# PENNSYLVANIA.

---

## Salathe *v.* Delaware, Lackawanna, & Western Railroad Company, Appellant.

*Negligence—Railroads—Grade crossing—"Stop, look and listen"—Signals —Province of court and jury—Speed.*

In a grade crossing case where the evidence is contradictory as to whether the approaching train gave a signal, the case should be submitted to the jury with proper explanations as to the relative value of the testimony of those who swore positively that they had heard the signal and the negative testimony of those who simply testified that they had not heard it.

While it may not be negligence for a railroad company to run a train in the open country at the rate of sixty miles an hour, still if it does so, it should give some warning or signal at crossings, and a court cannot be convicted of error in referring to such a rate of speed in connection with proper instructions as to signals at crossings.

*Negligence—Railroads—Grade crossings—" Stop, look and listen "—Driving cattle over tracks.*

Those who are about to drive a herd of cattle across a railroad track over which express trains are run at a high rate of speed, must first take the necessary precautions to ascertain whether trains are approaching. After the herd is once started across the track it may be impossible to turn them back or divide them until all have passed. When a herd is very large it may be incumbent upon those having them in charge to divide them, so as not to occupy the crossing for a length of time which would involve danger.

The fact that a person who was leading a herd of cattle has stopped, looked and listened, does not relieve all intelligent persons following after from exercising the care demanded from the circumstances, nor from the operation of the rule of law that they must stop, look and listen for approaching trains.

VOL. XXVIII—1 (1)

Where a person leading a cow by a rope followed by twelve other head of cattle, stops, looks and listens three feet from the track where an approaching train would be visible for a mile and nine-tenths, and after he has gone seventy-five or eighty feet, a train going at the rate of sixty miles an hour, strikes and kills some of the cattle, and these facts are contradicted, the case is for the jury.

Argued Jan. 10, 1905. Appeal, No. 65, Jan. T., 1905, by defendant, from judgment of C. P. Monroe Co., Sept. T., 1902, No. 17, on verdict for plaintiff in case of William E. Salathe and L. Frederick Salathe, trading as Salathe Brothers v. Delaware, Lackawanna & Western Railroad Company.    Before RICE, P. J., BEAVER, ORLADY, SMITH, PORTER, MORRISON and HENDERSON, JJ.    Judgment modified.

Trespass for loss sustained by reason of injuries at a grade crossing.    Before LYNCH, P. J., specially presiding.

The facts appear by the opinion of the Superior Court.

Defendant filed the following points :

4. Under the testimony of the plaintiff, Akers stopped to look and listen at a point where he must have seen and heard the approaching train if he looked and listened at all, and his signalling to Salathe to come on was negligence on his part and the plaintiffs cannot recover. *Answer :* I decline to affirm this point. [1]

1. It was the duty of William E. Salathe in approaching the crossing where the accident occurred to stop, look both ways and listen for approaching trains.    According to the testimony he did not do this, therefore he was guilty of contributory negligence and the plaintiffs cannot recover for any injury to him. *Answer:* I decline to charge as requested here.    We think under the testimony he did, if the jury believe he did, stop, look and listen through Akers. [2]

3. In approaching the crossing, the horses and wagon were in charge of the plaintiff's servant Shafer and it was his duty to stop, look and listen before attempting to cross the track. He did not do this and the plaintiff cannot recover for the injuries to the wagon, harness or horses. *Answer:* I decline to charge as requested in this point for the reason given above. [3]

5. There is no-limit to the rate of speed at which a railroad

company may run its trains through the open country and over the crossings of country roads, so long as the bounds of safety to passengers are not transgressed. Sixty miles an hour is not an unusual speed for express trains in the open country, and the defendant was not guilty of negligence in running its train at that speed while approaching the Turner crossing. *Answer :* I decline to charge as requested. Usually this is correct, but the last part which says the defendant was not guilty of negligence in running its train at such speed while approaching Turner crossing, is not correct. If the ice train were out of the question I could affirm this point. [4]

7. Under all the evidence in the case the verdict should be for the defendant. *Answer :* The last point being for binding instructions it is denied. [5]

The court charged in part as follows :

[Railroad companies have a right to run their express trains at a high rate of speed, and where the way is open a high rate of speed is not of itself negligence. The plaintiffs do not so claim, but the plaintiffs claim under the circumstances here and the evidence adduced, the rate of speed is to some extent a question for the jury to pass upon, that is with the ice train obstructing the view of persons approaching the crossing upon the public highway, and Mr. Smith, the engineer called by the defendant, testified that the ice train obstructed his view from the engine as to persons approaching the crossing.] [6]

[Mr. Akers should have continued on his guard and Mr. Salathe should have been on his guard the whole way. This does not mean the railroad company has any more right than an individual. The public highway is made for use of the people, and they have a right to use it in a proper way, and you will understand according to modern methods of travel railroad trains are required to make very fast time ; people know this and therefore when about to cross a place of this kind, especially with cattle and such a layout as this man had, should use care under the circumstances existing at the time.] [7]

Verdict and judgment for plaintiff for $418. Defendant appealed.

*Errors assigned* were (1–7) above instructions, quoting them.

*A. Mitchell Palmer* and *Everett Warren*, of *Willard, Warren & Knapp*, for appellant.—It was error to submit the case to the jury: Carroll v. Penna. R. R. Co., 12 W. N. C. 348 ; Custer v. B. & O. R. R. Co., 206 Pa. 529 ; Myers v. B. & O. R. R. Co., 150 Pa. 386 ; Urias v. Penna. R. R. Co., 152 Pa. 326.

There is no limit to the rate of speed at which a railroad company may run its trains through the open country and over the crossings of country roads, so long as the bounds of safety to patrons are not transgressed : Reading, etc., R. R. Co. v. Ritchie, 102 Pa. 425 ; Newhard v. Penna. R. R. Co., 153 Pa. 417 ; Childs v. Penna. R. R. Co., 150 Pa. 73.

*Wilton A. Erdman*, for appellees.—In order to justify the court in treating the question of contributory negligence as one of law, not only the facts but the inferences to be drawn from them must be free of doubt. If there is doubt as to either, the case must go to the jury: Muckinhaupt v. Erie R. R. Co., 196 Pa. 213 ; Elston v. D. L. & W. R. R. Co., 196 Pa. 595 ; Kuntz v. N. Y., C. & St. L. R. R. Co., 206 Pa. 162 ; Coolbroth v. R. R. Co., 209 Pa. 433 ; Conyngham v. Erie Electric Motor Co., 15 Pa. Superior Ct. 573.

Whenever there is a conflict of testimony or for any cause there is a reasonable doubt as to the facts, or as to the inferences to be drawn from them, negligence is always a question for the jury: Graham v. Philadelphia, 19 Pa. Superior Ct. 292 ; Laib v. Penna. R. R. Co., 180 Pa. 503.

Where a person without fault on his part finds himself in a position of danger he cannot, in an effort to extricate himself, be held to the use of the best judgment: Cannon v. Traction Co., 194 Pa. 159 ; Stover v. Penna. R. R. Co., 195 Pa. 616.

Our contention is that the rate of speed at which the train was running at that particular crossing at the time of the collision was a question for the jury to pass on in determining whether, under all the circumstances, there was negligence on the part of the defendant: Kinter v. Penna. R. R. Co., 204 Pa. 497.

The standard of negligence is what persons of ordinary prudence and carefulness would do under the same circumstances: Muckinhaupt v. Erie R. R. Co., 196 Pa. 213 ; Newhard v. Penna. R. R. Co., 153 Pa. 417 ; Childs v. Penna. R. R. Co.,

150 Pa. 73; Laib v. Penna. R. R. Co., 180 Pa. 503; Reeves v. R. R. Co., 30 Pa. 454.

OPINION BY PORTER, J., April 17, 1905:

This litigation arises out of a grade crossing accident. William E. Salathe, a member of the plaintiff firm, assisted by Friend Akers, an employee, was driving a number of cattle, the property of the firm, along the public highway. Akers was in advance, leading a cow secured by a rope, followed by twelve other head of cattle, and Salathe, who was also on foot, driving the herd, brought up the rear. Following Salathe, at what distance back does not clearly appear, was Charles Shafer, another employee of the firm, driving two horses hitched to a buggy, the property of the firm. Akers, followed by most of the cattle, had crossed the track, when a train operated by the servants of the defendant company, approaching from the west, ran over the crossing, killing three of the cattle and one horse, and destroying the buggy and harness; and Salathe, in attempting to keep the horses from running upon the track, was struck by the wheel of the buggy and injured. Shafer, who was riding in the buggy and driving the horses was killed. The plaintiff firm thereupon brought this action, averring the right to recover the value of the cattle and horse killed, which were the property of the firm, and for the loss of the services of William E. Salathe, a member of the firm, and for the amount paid by Salathe for medical attendance.

The plaintiff offered evidence which, if believed, warranted a finding that Akers, under instructions from Salathe, when he reached the crossing stopped, looked and listened, and neither seeing nor hearing an approaching train, signaled to Salathe that all was right and immediately proceeded to lead the cow across the track. He had cleared the track and had passed some seventy-five feet beyond, the cattle driven by Salathe following, before the train reached the crossing. Salathe depended upon his employee Akers to look out for approaching trains and did not himself stop, look or listen; when about eight or ten feet from the track he saw a train about 800 or 900 feet distant rapidly approaching from the westward, he jumped back and motioned to Shafer who was driving the team to stop, but Shafer either did not or could not stop, and

either the team ran into the train or the train ran into the team, and one horse was killed, the buggy smashed and the harness broken. The evidence clearly indicated that Shafer, who was in charge of the team, did not stop, look and listen upon approaching the track.

The evidence submitted by plaintiff tending to show negligence on the part of the defendant company related entirely to the failure to blow the whistle or ring the bell when the train approached the crossing. Several witnesses testified that the bell was not rung and that the whistle was not blown until the locomotive was almost upon the crossing. One of these witnesses, who was near the point where the whistle was ordinarily blown for that crossing, testified that he observed this train to see whether it would whistle, and that the whistle was not blown until the train was near the crossing. This testimony was directly contradicted by several witnesses who testified that the bell was rung and that the whistle was blown when the locomotive was at the whistle post, about 900 feet from the crossing. The learned judge in submitting the case to the jury referred to the speed at which the train was running, conceded to have been sixty miles an hour, but this was done in language from which the jury certainly could not have inferred that they might find the defendant company guilty of negligence because of the rate of speed at which the train was moving; it was simply an explanation to the jury of the necessity for some warning of the approach of the train to the crossing. The jury were told that unless they found the defendant company was negligent in failing to give warning of the approach of the train by ringing the bell or blowing the whistle, and that such negligence alone caused the injury, their verdict must be for the defendant. The court, in affirming a point submitted by the defendant, correctly explained to the jury the relative value of the testimony of those who swore positively that they had heard the whistle, and the negative testimony of those who simply testified that they had not heard it. The testimony upon this point was conflicting and was properly submitted to the jury: Childs v. Pensylvania Railroad Company, 150 Pa. 73; Urias v. Pennsylvania Railroad Company, 152 Pa. 326. The jury having found for the plaintiff we must assume that the employees

of the defendant company were guilty of negligence in failing
to blow the whistle or ring the bell as the train approached the
crossing.

There was a conflict of evidence, also as to whether Akers,
to whom the plaintiff had delegated the duty of looking out
for approaching trains, exercised the care required of him by
the law before starting to lead the herd across the track.
Salathe testified that Akers stopped when he reached the track,
looked along the track, and then signaled that all was right.
Akers himself testified that when within three or four feet
of the track he stopped, looked up and down the track, and
listened for approaching trains ; that he heard none and there
were none in sight on the main track.   The engineer of the
train and another employee of the defendant company directly
contradicted this testimony and swore that when Akers led
the first cow upon the track the approaching locomotive had
already whistled and was in full view between the whistle post
and the crossing.   It is an undisputed fact that at a point
three feet from the outer rail, where Akers testified he stopped,
the track over which the train approached was visible for a
mile and nine-tenths.   It is contended on behalf of the ap-
pellant that, because of the events which so quickly followed,
it is conclusively established that the train must have been
in sight at the time Akers testified he stopped, looked and
listened ; and that the case is within the rule recognized in
Carroll v. Pennsylvania R. R. Co., 12 W. N. C. 348 ; Myers v.
B. & O. R. R. Co., 150 Pa. 386 ; Urias v. Pennsylvania R. R.
Co., 152 Pa. 326 and Holden v. Pennsylvania R. R. Co., 169
Pa. 1.   One who is struck by a moving train which was plainly
visible from the point he occupied when it became his duty to
stop, look and listen, must be conclusively presumed to have dis-
regarded that rule of law and of common prudence, and to have
gone negligently into an obvious danger.   Had Akers been
struck by the train the moment he entered upon the track, it
would have been absolutely certain either that he had not looked
for the train, or that having looked he saw it and took the
chances of crossing before it reached him ; for no train could
have traveled one and nine-tenths miles, while he was walking
three feet : Marland v. Pittsburg & Lake Erie R. R. Co., 123 Pa.
487.   That, however, is not this case.   Akers was not struck by

the train, he had safely crossed the tracks and was seventy-five or eighty feet beyond, the rate at which he was traveling is uncertain. Salathe drove the other cattle after Akers, and the rate at which cattle move is not always either rapid or regular. We cannot with safety arbitrarily assume that Salathe must have been able to drive all of the cattle over the track within less than two, three or four minutes after Akers had started to cross. We are, therefore, of opinion that the question whether those in charge of the cattle were negligent in the management of them before and during the passage of the herd across the track, was one to be passed upon by the jury under the conflicting evidence: Laib v. Pennsylvania R. R. Co., 180 Pa. 503; Muckinhaupt v. Erie Railroad Co., 196 Pa. 213. The jury having found for the plaintiff we must assume that the train was not in sight at the time Akers stopped, three feet from the track, and looked and listened to guard against the approaching danger. This is the theory upon which the case was submitted to the jury by the learned judge of the court below, and it is the only theory upon which this judgment can be sustained.

Those who are about to drive a herd of cattle across a railroad track, over which express trains are run at a high rate of speed, must first take the necessary precautions to ascertain whether trains are approaching. After the herd is once started across the track it may be impossible to turn them back or divide them until all have passed. When a herd is very large it may be incumbent upon those having them in charge to divide them, so as not to occupy the crossing for a length of time which would involve danger. The court below would not have been warranted, under the facts as presented, in holding as matter of law that the plaintiffs were guilty of negligence in driving twelve head of cattle over the crossing, after Akers had ascertained that there was no train then in sight or hearing. The court instructed the jury, in substance, that if the train was in sight at the time Akers started to cross the track, the plaintiffs were not entitled to recover. The case was properly submitted to the jury in so far as it related to the liability of the defendant company for the value of the cattle which were killed. Akers and Salathe not having been guilty of contributory negligence in starting the herd across the track, the sudden rush

of the train without warning over the crossing necessarily re-
sulted in the loss, for cattle are not presumed to have that
intelligence which would enable them to avoid the danger.

When we come to consider the liability of the company to
make compensation for the injury to Salathe and the loss of the
horse, buggy and harness, an entirely different question is pre-
sented.    Neither Salathe, who was walking, nor Shafer, who
was in the buggy, driving the horses, stopped, looked or listened,
as they were approaching this crossing.    Salathe testified that
when he was eight or ten feet from the track he saw the train
coming up by the whistling post, 900 or 1,000 feet from the
crossing ; that he jumped back and motioned to Shafer to hold
on, there was a train coming, but that Shafer could not stop the
team, and team and train met at the crossing.    He did not tes-
tify as to whether the train or the team reached the crossing
first.    The engineer testified that the team did not strike the
locomotive, but that after the locomotive had passed the cross-
ing it ran against the end of the baggage car.    Salathe was not
struck by the train, but by the front wheel of his own buggy.
The loss of the horse and the injury to Salathe both resulted
from the failure of Shafer to control the horses, after he had
driven them without looking where he was going, into a place
of manifest danger.    The defendant submitted one point re-
questing the court to charge the jury that it was the duty of
Salathe in approaching the crossing to stop, look and listen for
approaching trains ; and also another point requesting an in-
struction that the horses and wagon were in charge of the
plaintiffs' servant, Shafer, and it was his duty to stop, look and
listen before attempting to cross the track.    The court refused
both points adding : " We think under the testimony, he did,
if the jury believe he did stop, look and listen, through Akers."
The court overlooked the fact that the plaintiffs were seeking
to recover for injuries to William E. Salathe, and for the value
of one of the horses which Shafer was driving.    The fact that
Akers, who was leading the herd of cattle, had stopped, looked
and listened, did not relieve all intelligent persons who subse-
quently traveled that road from exercising the care demanded
by the circumstances, nor from the operation of the rule of law
that they must stop, look and listen for approaching trains.
The court below held, and correctly so, that there could be no

recovery even for the loss of the cattle if the train was in sight at the time Akers stopped to ascertain whether it was safe for the herd to cross. We must, therefore, accept the conclusion that the train had not yet rounded the curve one mile and nine-tenths away at the time Akers started to cross the track. The train reached the crossing in advance of Shafer with the horses and buggy. It must, therefore, have traveled almost two miles after any person had stopped to look and listen for its approach. The evidence is not clear as to how far distant from the crossing Salathe and Shafer were at the time Akers stopped, but at least two minutes of time must have elapsed after Akers crossed before Shafer reached the crossing. Neither Salathe nor Shafer stopped at any time. The mere fact that Akers had stopped two minutes before Shafer reached the crossing did not relieve the latter from the duty to stop, look and listen when he arrived at a proper point for observation before he attempted to take the team of which he was in charge across the track. The defendant was entitled to an unqualified affirmance of both the points in question: Urias v. Pennsylvania R. R. Co., 152 Pa. 326; Myers v. B. & O. R. R. Co., 150 Pa. 386; Muckinhaupt v. Erie Railroad Co. 196 Pa. 213.

The facts as found by the jury establish the right of the plaintiff to recover the value of the loss of the cattle which were killed. There was no material controversy as to the value of the cattle, the horse and the harness, nor was there any conflict of testimony as to the value of the time lost by Salathe and the amount paid by him for medical attendance. The jury returned a verdict for the exact amount of his claim for the aggregate of the items. The amount included in the verdict for the loss of the cattle is therefore clearly ascertainable, it is the amount which the Salathes testified they were worth, viz.: $120. The plaintiffs were under the facts as found by the jury entitled to a judgment for this amount and no more. We will accordingly modify the judgment, instead of sending it back for a new trial.

The judgment is modified, and judgment is now entered in favor of the plaintiffs and against the defendant for $120, with interest from March 1, 1904, and costs.