## LEHIGH VALLEY R. CO. v. KILMER.

(Circuit Court of Appeals, Second Circuit. March 14, 1916.)

No. 202.

1. RAILROADS ⬤═312(3)—ACCIDENTS AT CROSSINGS—NEGLIGENCE—SIGNALS.

Even if there is no statute requiring signals at highway crossings, so as to make the engineer's failure to sound them negligence per se, such failure is negligence, if ordinary care in the operation of trains requires that they be given.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 990; Dec. Dig. ⬤═312(3).]

2. RAILROADS ⬤═351(9)—ACCIDENTS AT CROSSING—INSTRUCTIONS—SIGNALS—SPEED.

In an action for injuries to an automobile chauffeur at a railroad crossing, a charge that it was the legal duty of the defendant to give some adequate warning of the approach of the train to the crossing, and to run its train at such speed, and to have it under such control, and to give such warning as to avoid doing unnecessary damage to those using, or about to use, the crossing, was correct.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1201½; Dec. Dig. ⬤═351(9).]

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. RAILROADS ⊙330(3)—ACCIDENTS AT CROSSING—CONTRIBUTORY NEGLIGENCE.

The failure of an engineer to sound the whistle or bell on approaching a highway crossing does not relieve the chauffeur from the necessity of taking ordinary precaution for the safety of himself and his party.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1073; Dec. Dig. ⊙330(3).]

4. RAILROADS ⊙335(5)—ACCIDENTS AT CROSSING—CONTRIBUTORY NEGLIGENCE—PROXIMATE CAUSE.

The failure of one about to cross a railroad track to use due care bars recovery, if such negligence proximately contributed to the injury, but not otherwise.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1028; Dec. Dig. ⊙335(5).]

5. RAILROADS ⊙324(1)—ACCIDENTS AT CROSSING—CONTRIBUTORY NEGLIGENCE—"DUE CARE."

"Due care," required of one about to cross a railroad track, means ordinary care, and implies the use of such watchfulness and precautions to avoid coming into danger as a person of ordinary prudence would use under the same circumstances, in view of the danger to be avoided, but does not require the use of extraordinary care, or the exercise of the best judgment or the wisest precaution.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1020, 1022, 1023; Dec. Dig. ⊙324(1).

For other definitions, see Words and Phrases, First and Second Series, Due Care.]

6. RAILROADS ⊙334—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE—ACT IN PERIL.

A chauffeur, who is suddenly put in peril by the negligent approach of a railroad train to a highway crossing, is excusable if he made an unwise decision as to what he should do.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1027; Dec. Dig. ⊙334.]

7. RAILROADS ⊙350(30)—ACCIDENTS AT CROSSING—EVIDENCE—CONTRIBUTORY NEGLIGENCE.

In an action for injuries to a chauffeur, whose automobile was struck by a train at a crossing, evidence *held* not to show, as matter of law, that plaintiff was contributorily negligent.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1189; Dec. Dig. ⊙350(30).]

8. RAILROADS ⊙347(11)—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE—LOOKOUT BY OTHERS.

In determining whether an employed chauffeur was negligent in approaching a railroad crossing, the fact that his employer was beside him, and was looking out for an approaching train, can be considered.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1134–1137; Dec. Dig. ⊙347(11).]

9. RAILROADS ⊙350(19)—ACCIDENTS AT CROSSING—CONTRIBUTORY NEGLIGENCE—PLACE AND TIME TO LOOK.

A chauffeur, approaching a highway crossing, who stopped and looked for an approaching train, is not negligent, as matter of law, because he did not stop and look at the precise place and time where and when looking would have been of most advantage.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1173; Dec. Dig. ⊙350(19).]

Ward, Circuit Judge, dissenting.

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Northern District of New York.

Action for personal injuries by Carl Kilmer against the Lehigh Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Cobb, Cobb, McAllister & Feinberg, of Ithaca (Riley H. Heath, of Ithaca, of counsel), for plaintiff in error.

Hiscock, Doheny, Williams & Cowie, of Syracuse, for defendant in error.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. This is an action to recover for injuries sustained by the plaintiff below in attempting to cross in an automobile the tracks of the defendant company at what is known as the Swarthout crossing, near Valois, N. Y. The automobile was struck by a locomotive drawing a passenger train. The plaintiff was acting at the time as chauffeur for an automobiling party including three other persons: Edgar A. Emens, who is professor of Greek in Syracuse University, his wife, and his sister. The two latter persons received injuries from which they died. Professor Emens and the plaintiff were injured.

At the time of the accident the party was riding in an Oldsmobile, on August 28, 1910. The plaintiff had driven the automobile for about four months, and before that had driven cars for about two years. The party had been to Fayette, and gone from there, by way of Geneva, to Penn Yan. They left the latter place at 2 o'clock in the afternoon on their way back to Fayette, and the accident occurred about 5 o'clock that afternoon. The rear curtain of the automobile was down and the side curtains were off.

The plaintiff had the kneecap of his left knee torn off, and the ligaments were torn loose from the knee and ankle of his leg; the left ankle was strained and wrenched, and the flesh and skin were torn off to the bone on his left shin; the bones of the left lower leg were splintered and bruised; and for a considerable period he was deprived of the use of his ankle and knee. At the trial, almost three years after the accident, he testified that he was unable "to do hardly anything, only sit around; I cannot use it any in doing hard work; I can't lift anything, only to stand on my right foot alone." He said he was unable to run, and that he could walk slowly without limping, but that he limped badly if he walked above a moderate gait. Three times since the accident the kneecap had slipped out of place, had slid out bad enough to let the knee water off the joint. "On each of those three occasions, when the cap has been dislocated enough to flow the water, it has swollen until it filled my trouser leg very nearly. I wear bandages on it yet." He also testified that his knee pained him all the while. The surgeon and physician who treated him testified that when he first saw his knee it was twice the normal size; that he thought his condition at the time of the trial was a permanent one, and that any strain like heavy lifting or pushing was liable to throw the kneecap out, and that running or fast walking was liable to have

the same effect; that the condition of his knee would grow worse as he got older; that he thought it would be necessary for him to wear bandages in order to obtain any use of it during the rest of his life. The jury found a verdict in his favor for $5,000.

[1] It is not necessary for us to consider at any length the negligence of defendant. The plaintiff proved that the engine gave no signal by bell or whistle until it gave the danger signal, two short blasts and two long ones, given just before or just as the engine struck the automobile. There were eight competent and disinterested witnesses, farmers and residents of the neighborhood, who testified positively that no bell rang and no whistle blew until the danger signal sounded. In addition a number of witnesses stated that they heard no bell or whistle. The evidence to the contrary given by the engineer and fireman and others evidently did not impress the jury.

In almost every state it is made by statute the duty of an engineer, in approaching a crossing, to sound his whistle, or ring his bell, or both. Where the statute imposes the duty, the failure to comply with it is negligence per se. Unless the duty is imposed by statute, the failure to give such signals is not as matter of law a neglect of duty. In such a case the failure to give the signals would be a question of fact for the jury to decide whether, under the circumstances, the omission amounted to a failure to exercise due care. In New York the General Railroad Act of 1850 made a railroad company liable for all damages sustained by the failure of an engineer to ring the bell or sound the whistle upon approaching a highway crossing. In 1886 the prior act was repealed. In a case which came before the Court of Appeals in 1892 the court, referring to this matter in Vandewater v. New York & New England Railroad Co., 135 N. Y. 583, 588, 32 N. E. 636, 637 (18 L. R. A. 771), said:

"Of course, the companies still owe a duty to the public at such crossings, as elsewhere. The duty is to run their trains with care and caution, and when they cross such roads it may well be that the failure to give due warning by whistle or bell, or in some other way, would be held, under all the circumstances, to be a failure to manage and run their train with proper care and caution, for which they would be liable to a party injured, if otherwise entitled to recover. Even when compelled by statute to make such signals, it is not necessarily a defense in all cases to prove that they were made. The making of the signals is the least the company can do, and in a given case it might not be enough." Harty v. Railroad, 42 N. Y. 468; Thompson v. Central Hudson R. R. Co., 110 N. Y. 636, 17 N. E. 690.

[2, 3] In the case at bar the trial judge instructed the jury as follows:

"In determining whether the defendant railway company was negligent or not, you must remember that it was the legal duty of the defendant to give some adequate or suitable warning of the approach of the train in question to the Swarthout crossing, where the accident occurred, and that at a suitable distance therefrom to give warning. As to the speed of the train, it was the duty of the defendant to run the same at such a rate of speed, and to have this train under such control, and to give such warnings in approaching the highway crossing, as to avoid doing unnecessary damage to those lawfully and properly using the same or about to use the same."

We find no error in the instruction in this particular, and the verdict has established the fact that the defendant was negligent. The

failure of the engineer to sound the whistle or ring the bell did not relieve the plaintiff from the necessity of taking ordinary precautions for his and his party's safety. The negligence of the defendant's employés would not excuse his negligence. Schofield v. Chicago, Milwaukee & St. Paul Ry. Co., 114 U. S. 615, 618, 5 Sup. Ct. 1125, 29 L. Ed. 224 (1885).

[4, 5] The failure of one about to cross a railroad track to use due care deprives him of his right to recover damages, if such negligence proximately contributed to the injury, but not otherwise. Shearman & Redfield on Negligence (6th Ed.) vol. 2, § 472. Due care in these cases means ordinary care. It implies the use of such watchfulness and precautions to avoid coming into danger as a person of ordinary prudence would use under the same circumstances in view of the danger to be avoided. But no greater care than that is required. Totten v. Phipps, 52 N. Y. 354; Davis v. Concord, etc., R. R. Co., 68 N. H. 247, 44 Atl. 388. A person is not bound to use extraordinary care or to exercise the best judgment or to use the wisest precaution. Lent v. N. Y. Central, etc., R. Co., 120 N. Y. 467, 24 N. E. 653.

[6] This brings us to inquire whether the plaintiff exercised the care which the law required him to exercise. What the plaintiff did after he got upon the track is not a matter of controlling importance. In such a case as that in which the plaintiff then found himself suddenly put in peril, he is excusable if he made an unwise decision as to what he should do. The rule on this phase of the matter is correctly laid down in Shearman & Redfield (6th Ed.) vol. 1, § 85a, where it is said:

"If one is placed by the negligence of another in such a position that he is compelled to choose instantly, in the face of grave and apparent peril, between two hazards, and he makes such a choice as a person of ordinary prudence placed in such a position might make, the fact that, if he had chosen the other hazard, he would have escaped injury, is of no importance. Even if, in bewilderment, he runs directly into the very danger which he fears, he is not at fault. The confusion of mind caused by such negligence is part of the injury inflicted by the negligent person, and he must bear its consequences."

[7] What the plaintiff did or did not do before he got upon the track is of greatest importance; and this brings us to inquire whether he exercised the care which the law required him to exercise before he attempted to cross the defendant's tracks. Did he approach the crossing with prudence and care and with senses alert to the possibility of approaching danger? Tolman v. S. B. & N. Y. R. Co., 98 N. Y. 202, 50 Am. Rep. 649.

The plaintiff knew for a distance of half a mile south of the crossing that he was approaching it. When he was about 825 feet from it he shut off the power and let his automobile coast to a point in the vicinity of the Swarthout hitching block, where he brought his car, as he testified, to a full stop. This was at a point 146 feet from the first rail of the west-bound track. He then looked both ways along the tracks, and, seeing no sign of a train, started towards the crossing and continued to look as well as he could, both ways, until he got on the crossing and saw the engine approaching him from about 200 feet

away. He heard no sound of the engine before he saw it. At that time his seat in the automobile was right over the first track. He then opened up the throttle of his machine just as wide as he dared to in an effort to get across ahead of the train, because, he said, he knew he couldn't stop to clear it. The locomotive hit the rear end of the automobile and threw it from the track, smashing it pretty well to pieces.

The plaintiff testified that before he approached the crossing and when he stopped his car to look and listen as above stated, there was a pear orchard between him and the railroad track, and that as he looked to, the south he could see the line of the rails for a little ways and the pear orchard, and that he looked as far as he could and "took a good look"; that before he got to the tracks he looked toward them several times. He was asked, "Will you swear you looked during the last 50 feet before you got to this railroad crossing and before you saw the train when you were on the crossing?" To which he answered, "Yes; I did." And he added, "I am positive I did." He was asked, "How far did you look?" He replied, "I looked the best I was able to in the car—looked back south as far as I could see."

Professor Emens who sat beside him in the automobile testified that the automobile had been running at a speed of 12 or 14 miles an hour, but when they reached the Swarthout block they slowed down to 5 or 6 miles an hour; that he was looking and listening; that just before ascending the grade to the tracks he looked up and down the tracks and said to the plaintiff, "It looks as if everything were all right," and they proceeded up the grade, and as the rear wheels of their car passed the first rail he saw the train coming on the other track at a distance of perhaps 300 feet; that that was the first sight he had caught of it; that before that time the train had not whistled; that he had looked the best he could, and was looking all the time; that he remembered that the automobile slowed down as it approached the crossing, but whether it stopped or not he could not be sure; that the top of the automobile interfered somewhat with his view, the highway being somewhat lower than the railroad tracks, but that he looked the best he could; that he had a clear view down the track, but his view in the other direction was obstructed and confusing because of the pear orchard and the cattle guards. He was asked:

"Now, Professor, how many times do you recollect looking? A. I recollect looking twice before the final look, and then before that I remember looking, and perhaps I might say looking continuously. Q. First one way and then the other. And you had your mind on the question that there was a crossing there? A. Absolutely. Q. And on the possibility of a train approaching? A. I did. Q. And did you see or hear that train before you saw it at the time you have described, about 300 feet away, after your car was up at the tracks? A. I did not."

[8] As the plaintiff was employed by the Professor, the fact that he was riding by the side of the plaintiff and was looking out for the train is a circumstance to be considered in judging the plaintiff's conduct on the subject of the latter's negligence. Mr. Emens testified that his view was obstructed and confusing, owing to the pear orchard and

cattle guards between the highway and the track. The plaintiff also refers in his testimony to the pear orchard. Coleman testified:

"Well, there was places that you could see; but you would have to get, well, very near opposite Swarthout's barn before you could see through, on account of buildings this side of the crossing there—Mr. Predmore's; then, if you happen to know just where to look, you could see clear to the curve."

Another witness, Smith, testified:

"I can't say positively whether there is any place where you can see down the track while you' are west of the pear orchard. My recollection is that you couldn't; I think the photographs show that you couldn't."

He also testified:

"I have been familiar with this crossing ever since the railroad was built. As you come from the south going north on that road there is an orchard and trees on the south side of that east and west road, and it hides your view till you get very near Mr. Swarthout's; and then, there is one place right in front of Mr. Swarthout's block where I always look; there you can see clean to the curve; and that is about, as they said here yesterday, about 125 feet; I should judge it was about 125 feet from the crossing. That is the location of Mr. Swarthout's stepping stone, or Swarthout's block. There is one place right there you can see very distinctly clean to the curve. As you approach along the road before you come to Mr. Swarthout's block you cannot see very distinctly. This was so at the time of the accident."

The defendant, however, claims that if plaintiff had stopped and looked as he said he did, he would have had an unobstructed view of the tracks; and that, if by chance he stopped his car at a place where he could not see 50 feet down the track, it was his duty to continue to take observations and to refrain from going on the track until he reached a point where he could see and determine that it was safe for him to proceed.

One of the plaintiff's witnesses was asked:

"Q. Now did you make a mark at a place 120 feet southwest of the crossing on the highway and look from there southerly toward the curve in the railroad tracks? A. That is from the first rail or from—from the east-bound track from the west. Q. Where was that point? A. That 120 feet? Q. Yes. A. From the west rail of the west-bound track, the center of the beaten highway. Q. From the first rail of the west-bound track? A. Yes, sir. Q. And where were you when you made that observation? A. Why, I was 120 feet— Q. Were you in your buggy I mean? A. Why, I was, and also when I was standing at different times. Q. Now how far south down the railroad track could you see from that point? A. I could see way up around the curve a little; three-quarters of a mile anyway. Q. You could see partly around the curve? A. Yes, sir. Q. And from that point up to the rails of the railroad track, the crossing there, did you from that point to point make observations from your buggy—while sitting in your buggy and while standing in the road, as to the view you had southerly down the railroad track? A. Yes, sir. Q. What did you find? A. Didn't find anything. Q. Find anything to obstruct your view? A. Nothing. Q. And those observations were made by you when the conditions were the same as at the accident? A. I should think they would be the same. Q. And from a point where you were either standing or driving on the traveled portion of the highway going north? A. Yes, sir. Q. At any point on the 120 feet was there any obstruction to an oncoming train from the south? A. I don't think there is. Q. And did you actually see trains coming at different occasions? A. I have. I have actually seen trains down as far as that curve; that is the engine, the first coach, from these various points 120 feet from the west rail of the west-bound track."

The question upon which this case must turn is whether upon the evidence the court was justified in leaving the question of contributory negligence to the jury, or whether the court should have decided that the evidence disclosed contributory negligence as a matter of law. If the plaintiff had an unobstructed view of the track, and might have seen the train if he had looked, and nevertheless went upon the track just as the train got to the crossing, he was guilty of contributory negligence as a matter of law, and is not entitled to recover.

[9] The record convinces us that between the Swarthout block, where the plaintiff stopped to look and listen, and the crossing where the collision occurred there were places where the plaintiff might have obtained an unobstructed view of the track for a considerable distance. But it does not necessarily follow as a rule of law that he is remediless because he did not look at the precise place and time when and where looking would have been of the most advantage. Rodrian v. N. Y., N. H. & H. R. R. Co., 125 N. Y. 526, 26 N. E. 741 (1891). The court below left the question of contributory negligence to the jury. The court in its charge said:

"This court is of the opinion that a person driving an automobile, a stranger to the locality, who approaches a railroad crossing and stops, or substantially stops, at a point 145 or 150 feet from the actual crossing, being less than 50 feet in a direct line from such tracks, and looks and listens, exercising due and reasonable and ordinary care in so doing, hears no train and no signal, and no signal is given, and who then proceeds at reasonable speed, continuing to look and listen and who neither sees or hears the approaching train which is coming nearly head on behind him on a downgrade, gliding or floating at from 40 to 60 miles per hour, without sounding bell or whistle, is not necessarily guilty of contributory negligence in not again stopping or in failing to see or hear the approaching train."

In our opinion the court was justified in reaching the conclusion it did. The question under all the circumstances was a proper one for the jury. The plaintiff stopped, looked, and listened if he told the truth, and whether he told the truth was for the jury. The question whether he exercised as much care in looking and listening as he should have done was also for the jury. The question whether, having stopped and looked and listened 145 feet from the crossing without seeing or hearing anything, ordinary care and prudence required him to stop again before going upon the tracks, and whether he could have been in the exercise of due care in looking and listening, when he neither saw nor heard this train until he got upon the track, were under all the circumstances questions of fact for the jury.

Judgment affirmed.

WARD, Circuit Judge (dissenting). As the defendant did not dispute its liability in this court, and the amount of the verdict is not a subject of review, the only question in the case is whether the plaintiff was guilty of contributory negligence. He employed an engineer to take measurements on the ground, who testified that at a point 146 feet south of the track on which the train was approaching there is an unobstructed view to the curve, that is, about 3,498 feet from the crossing, and at a point 100 feet south an unobstructed view for 3,386 feet. Such obstructions as were spoken of, as, for instance, fences,

cattle guards, telegraph poles, interfered no more with the plaintiff's vision than would a balloon or a bird flying in the air. Giving the train 60 miles and the car 8 miles an hour, which are the highest speeds testified to, the train would move 88 feet and the car nearly 12 feet a second; in other words, at a point 146 feet south of the place of collision one could see the train approaching about 1,520 feet away, and one who started from that point, as the plaintiff says he did, would at 8 miles an hour arrive at it in 15 seconds, with the train in full view all the time. The plaintiff testified he stopped at the 146-foot point, looked, and did not see the train, and then started up and looked, and did not see it until the train was within 200 feet. This testimony cannot be believed. If he had looked, he must have seen it in time to avoid the collision, because he said he could stop his car in 6 feet.

I think the plaintiff was guilty of contributory negligence as matter of law and that a verdict should have been directed for the defendant. Dolfini v. Erie R. R. Co., 178 N. Y. 1, 70 N. E. 68; Northern Pacific Railroad Cos. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014.