### DERNBERGER v. BALTIMORE & O. R. CO.

(Circuit Court of Appeals, Fourth Circuit. May 17, 1917.)

No. 1474.

**1. TRIAL ⬤142—QUESTIONS FOR JURY—INFERENCES FROM EVIDENCE.**

Whenever the evidence is such that reasonable men may reasonably differ as to the inferences to be drawn therefrom, the case should be submitted to the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 337.]

**2. TRIAL ⬤168—DIRECTION OF VERDICT—INFERENCES FROM EVIDENCE.**

Where from the evidence only one inference may be reasonably drawn, it is the imperative duty of the court to direct a verdict.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 341, 376–380.]

**3. TRIAL ⬤168—DIRECTION OF VERDICT—WHEN WARRANTED.**

It is the duty of the trial court to direct a verdict for plaintiff or defendant, as to the court may seem proper, where the evidence is uncontradicted, or of such conclusive character that the court in the exercise of a sound judicial discretion would feel impelled to set aside a verdict in opposition to it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 341, 376–380.]

**4. RAILROADS ⬤328(1)—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—OBSTRUCTION OF VIEW.**

Where at a railroad crossing there is a heavy growth of weeds, underbrush, etc., so as to obscure the view of the track in the direction from which a train comes, such condition is a warning to a driver on the highway of the imminence of danger, and in the nature of an admonition to exercise reasonable caution in approaching the track.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1057, 1060, 1069.]

**5. RAILROADS ⬤348(8)—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—EVIDENCE.**

In an action for death in a crossing accident, evidence *held* to show that, from a point 150 feet from the crossing, deceased drove towards and upon the crossing without looking or listening, and apparently oblivious to the fact that he might encounter a train in so doing.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1146.]

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. RAILROADS ⬨⟶335(3)—CROSSING ACCIDENTS—CONTRIBUTORY NEGLIGENCE—EFFECT.

The failure of a railroad train to give a signal in approaching a crossing, by ringing the bell or blowing the whistle, as required by statute, does not make the railway company liable to one who drives upon the crossing without looking or listening for trains.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1087.]

7. RAILROADS ⬨⟶348(9)—CROSSING ACCIDENTS—CONTRIBUTORY NEGLIGENCE—WEIGHT OF EVIDENCE.

In an action for death in a crossing accident, evidence as to the space intervening between obstructions and the crossing, and the distance one could have seen along the track in the direction from which the train came, *held* sufficient to show that, if deceased had looked and listened before going upon the crossing, he could have seen or heard the approaching train in ample time to avoid the accident.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1147.]

8. COURTS ⬨⟶368—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION.

If a decision of a state court overruled prior decisions, a federal court was not bound by such decision as to a cause of action which accrued prior to the date of its rendition.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 951.]

9. COURTS ⬨⟶370—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION.

In the absence of a well-established rule by the state court, the federal court is warranted in forming its independent judgment.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 953, 953½.]

10. RAILROADS ⬨⟶328(4)—CROSSING ACCIDENTS—CONTRIBUTORY NEGLIGENCE—OBSTRUCTION OF VIEW.

Where, notwithstanding obstructions to the view of approaching trains, a driver on a highway could have seen or heard an approaching train in ample time to avoid an accident, if he had looked and listened, but, from a point 150 feet from the crossing, he drove towards and upon the crossing without looking and listening, apparently oblivious to the danger, he did not exercise the care that a reasonable man would take for his own protection, and there could be no recovery for his death.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1061.]

In Error to the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Action by Martha Dernberger, administratrix of the estate of Benjamin Dernberger, deceased, against the Baltimore & Ohio Railway Company. From a judgment for defendant on a directed verdict (234 Fed. 405), plaintiff brings error. Affirmed.

C. M. Hanna and Reese Blizzard, both of Parkersburg, W. Va. (R. E. Bills, of Parkersburg, W. Va., on the briefs), for plaintiff in error.

George M. Hoffheimer, of Clarksburg, W. Va., and B. M. Ambler, of Parkersburg, W. Va. (J. W. Vandervort and Van Winkle & Ambler, all of Parkersburg, W. Va., on the briefs), for defendant in error.

E. G. Smith and Stephen G. Jackson, both of Clarksburg, W. Va., amici curiæ.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

⬨⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

PRITCHARD, Circuit Judge. This action was instituted in the District Court of the United States for the Northern District of West Virginia by Martha Dernberger, administratrix of Benjamin Dernberger, deceased, against the Baltimore & Ohio Railroad Company, to recover damages for alleged injuries sustained by Benjamin Dernberger at the hands of defendant in error, under chapter 103, section 3488, of the Code of West Virginia, which is in the following language:

"Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof; then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter."

The case is now before us on a writ of error. The plaintiff in error will be referred to as plaintiff, and the defendant in error as defendant; such being the relative positions the parties occupied in the court below.

An action of this kind always presents points more or less difficult of solution, involving as it does primarily on the one hand the question as to whether the alleged injuries of the plaintiff were occasioned by the negligence of the railroad company, or whether on the other hand the plaintiff by his negligence contributed to his own injury to such an extent as to warrant the trial judge in holding as a matter of law that the defendant upon the whole evidence is entitled to have the court instruct the jury to return a verdict in its favor. So much has been written in regard to this question that it would be impractical to undertake to distinguish all the cases decided by the different courts of the several circuits, as well as the courts of last resort of the states, and relied upon by counsel for the respective parties. Therefore, we shall confine our discussion to what we deem to be some of the controlling cases.

Counsel for plaintiff's intestate have filed four briefs, counsel for defendant five, and counsel as amici curiæ two. While the briefs thus filed are voluminous, we greatly appreciate the industry and skill displayed by counsel in attempting to throw as much light as possible upon a proposition which is extremely complicated when we come to apply the law to the facts as testified to by the witnesses in the court below. It is earnestly insisted by counsel for plaintiff that the court below erred in directing a verdict in favor of the defendant; in other words, that the death of plaintiff's intestate was due to the negligence of the defendant in failing to give a signal while approaching the crossing as required by the statute of West Virginia.

[1-3] Counsel earnestly contend that the conflict of evidence in this case is such that the court below should have submitted the determination of the same to the jury. The rule is that, whenever the evidence is such that reasonable men may reasonably differ as to the inferences to be drawn therefrom, the case should be submitted to the jury. While

this is true, it is well settled that where, from the evidence, only one inference may be reasonably drawn, it is the imperative duty of the court as a matter of law to direct a verdict. In other words, it is the duty of the trial court to direct a verdict for the plaintiff or defendant, as to the court may seem proper, where the evidence is uncontradicted, or of such conclusive character that the court, in the exercise of a sound judicial discretion, would feel impelled to set aside a verdict in opposition to it. Merchants' Bank v. State Bank, 10 Wall. (77 U. S.) 604, 19 L. Ed. 1008; Delaware, Lackawanna & Western Railroad Company v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Patton v. Texas & Pacific Railway Company, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; Southern Pacific Company v. Pool, 160 U. S. 438, 16 Sup. Ct. 338, 40 L. Ed. 485; Zilbersher v. Pennsylvania R. Co., 208 Fed. 280, 125 C. C. A. 480; Union Pacific Railway Company v. McDonald, 152 U. S. 262, 14 Sup. Ct. 619, 38 L. Ed. 434; Elliott v. Chicago, Milwaukee & St. Paul Railway Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068.

An examination of the cases cited will show that the court not only had the power, but it is its duty in cases like the one at bar, as well as all other cases involving a trial by jury, to direct a verdict whenever the facts are such as to warrant the same. Mr. Justice Swayne, in the case of Meguire v. Corwine, 101 U. S. 108, 25 L. Ed. 899, in referring to this point says:

"A judge has no right to submit a question where the state of the evidence forbids it."

In the case of Southern Pacific Railway Company v. Pool, supra, Chief Justice White, who was then Associate Justice, among other things, said:

"There can be no doubt where evidence is conflicting that it is the province of the jury to determine, from such evidence, the proof which constitutes negligence. There is also no doubt, where the facts are undisputed or clearly preponderant, that the question of negligence is one of law. Union Pacific Railway Company v. McDonald, 152 U. S. 262, 283 [14 Sup. Ct. 619, 38 L. Ed. 434]. The rule is thus announced in that case: 'Upon the question of negligence * * * the court may withdraw a case from the jury altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. Delaware, Lackawanna, etc., Railroad v. Converse, 139 U. S. 469, 472 [11 Sup. Ct. 569, 35 L. Ed. 213], and authorities there cited; Elliott v. Chicago, Milwaukee & St. Paul Railway, 150 U. S. 245 [14 Sup. Ct. 85, 37 L. Ed. 1068]; Anderson County Commissioners v. Beal, 113 U. S. 227, 241 [5 Sup. Ct. 433, 28 L. Ed. 966].' "

This being the rule, the question arises as to whether the facts as established in the court below were such as to warrant the learned judge who heard this case in directing a verdict in favor of the defendant.

It is insisted by counsel for defendant that the evidence brings this case clearly within the rule announced in Neininger v. Cowan et al., 101 Fed. 787, 42 C. C. A. 20; Beyel v. Newport News & M. V. R. Co., 34 W. Va. 538, 12 S. E. 532; Horn v. Baltimore & O. R. Co., 54 Fed.

301, 4 C. C. A. 346; Chicago, M. & St. P. Ry. Co. v. Bennett, 181 Fed. 799, 104 C. C. A. 309; Shatto v. Erie R. Co., 121 Fed. 678, 59 C. C. A. 1; Northern Pac. Ry. Co. v. Alderson et ux., 199 Fed. 735, 118 C. C. A. 173; Southern Ry. Co. v. Carroll, 138 Fed. 639, 71 C. C. A. 88; Railroad Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542. Counsel also cite numerous other cases. The plaintiff's intestate relies upon the cases of Continental Improvement Company v. Stead, 95 U. S. 161, 24 L. Ed. 403; Grand Trunk Railway Company v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485; Flannelly v. Delaware & Hudson Co., 225 U. S. 597, 32 Sup. Ct. 783, 56 L. Ed. 1221, 44 L. R. A. (N. S.) 154; Baltimore & Ohio Railroad Company v. Griffith, 159 U. S. 603, 16 Sup. Ct. 105, 40 L. Ed. 274; Lehigh Valley R. Co. v. Kilmer, 231 Fed. 628, 145 C. C. A. 514; Morrissey v. Boston & L. R. R. Co., 216 Mass. 5, 102 N. E. 924; City of Elkins v. Western Maryland Co., 86 S. E. 762; and numerous other cases.

[4] The danger incident to a crossing is increased or diminished according to the nature of the land on either side of the road over which one must travel to reach the same. Where the banks are level, and the intervening space between the road and the railroad consists of cleared land, the risk is less; but where, as in this instance, it appears that there is a heavy growth of weeds, underbrush, etc., so as to obscure the view of the track beyond the crossing in the direction from whence the train comes, the risk is correspondingly increased. Such condition is a warning to the traveler of the imminence of danger, and in the nature of an admonition to exercise reasonable caution in approaching a railroad track; also, the means of transportation employed by the traveler becomes an important factor in determining the degree of diligence to be exercised. These are questions that are important, and must be considered by the court in a case like the one at bar, in determining whether the negligence of the deceased was the proximate cause of his injury.

In this instance the deceased, a farmer, had lived in the vicinity of the crossing where the accident occurred for many years, and it is but fair to assume that he was familiar with the location of the track at the point of crossing, and was also familiar with the approach thereto. Under these circumstances, he must have been fully cognizant of the risks incident to crossing at this point, and, as a matter of common knowledge, he must have known that the railroad company operated over its tracks heavy freight trains incapable of being promptly stopped, and his expression at the fatal moment, "My God, there is the Fast Line!" shows that he appreciated the fact that passenger trains of a high rate of speed were passing to and fro during the day. This expression, which is the last one that the deceased ever made, also shows that he understood that in crossing the track a fast train might be expected at or about that time, and that he had made a fatal mistake in going upon the track without first looking and listening. Plaintiff introduced a number of witnesses, but before she rested her case defendant's counsel introduced two witnesses. At the conclusion of the evidence the defendant moved the court to direct a verdict in its favor, and in response thereto the court below granted the motion.

The deceased came to his death on the afternoon of July 27, 1915, between 4 and 5 o'clock, at a point about 15 miles below Parkersburg, at a country crossing where the dirt road crosses the Ohio Division of the defendant. The railroad station is situated about one-half mile north of the crossing, which is known as the Cove Run Crossing. The railroad runs nearly north and south and somewhat parallel with the river. The highway from Bellville runs south between the railroad and the river. When within about 200 feet of the railroad, it turns sharply to the east and crosses it. The train by which Dernberger was killed was coming from the south, and was due to pass this crossing at about 4:20 p. m., and was known as the "Fast Line Express."

On the afternoon of the accident the deceased had gone to the depot to meet his daughter and a young lady, who had arrived that afternoon to pay her a visit. For some reason the young ladies preferred not to go in the wagon, but took a short cut, intending to get in the wagon after it had passed the crossing. They walked down the track where the accident occurred at a slow gait, consuming about 20 minutes, expecting to meet the deceased. It appears that they were listening "for the train," knowing that it was about time for "another train." Not finding the deceased, they started along the highway and had gone but a short distance east of the crossing when the accident happened.

The deceased, after leaving Bellville, and while proceeding towards the crossing, passed his son-in-law, Mike R. Buffington, on the road, who was also driving a team. The wagon in which deceased was riding was of a peculiar type; the wheels, hubs, etc., being of iron. The wheels were 36 inches in diameter. The bottom of the bed, which rested on the axles, was 19 or 20 inches from the ground. The team consisted of a pair of "right sprightly horses," about four years old, "which acted like any other horses." The top of the wagon bed was 37 inches, coming to the top of the wheels. Buffington, whose wagon was heavily loaded (his horses being "scary" and afraid of the trains), dropped back and let the deceased pass. Buffington says that when about 345 or 350 yards from the crossing his attention was called to the train, and that he knew that it was after time for the train to come, and that it had not come up.

After passing Buffington the deceased was joined by George Anderson and Charles Barton, who got into the wagon for the purpose of riding a part of the way to their respective homes; it being the intention of Anderson to get off at the crossing. Anderson had been employed by the railroad company for seven years, and had worked "right along that crossing." Barton had also worked for the company. Anderson stated that after he got in the wagon deceased said that it (the wagon) was not fit for the public highway on account of being so low, but that it was handy in hauling hay and wheat in; that it could be driven over rough ground without being upset, and that it was not fit for the roads. He said that "we talked about hauling in hay and wheat, and how nice the wagon was on the place"; that when the wagon reached a point about 200 feet from the track a trace became unhooked, and the deceased got out and hooked it up, and then got in the wagon and started again, the horses going in a prance or trot for

about 50 feet; that within about 150 feet of the track, where the up-grade commenced, the horses were checked down to a slow walk; and that just before reaching the crossing the horses were traveling not over 2 miles an hour. Witness also testified that when about 150 feet from the crossing the deceased "looked and listened, but did not see any train or hear any," and he checked the horses and looked for the train; that the south side of the road was all grown up with weeds, apple trees, horse weeds, elms, etc., there being horse weeds at this point 12 or 14 feet high. The witness, in referring to what they did at this point, said that they "pulled to the right," but that the railroad could not be seen on account of the growth of weeds, brush, and trees, and that there was a cornfield there on the right of way which hid their view.

Traveling in the direction of the crossing in which the parties were going at the time, there was a curve in the highway where it turned from north and south to west and east. The witnesses vary as to the location, width, and opportunity to see by the opening at this point, which is but natural, where parties rely upon recollection, without having made actual measurements. However, they all agree that a train on the track could be seen through this opening, but in order for a person riding in a wagon to see through the same it would be necessary for him to "raise up"; that this would be especially true where one was riding in a wagon the height of the one used by de-ceased. Anderson testified that it was a narrow space about 150 feet from the crossing, and that by rising up in the wagon one could see two rail lengths of the railroad, or cars on it at a distance of about 11 rods down the track. Thomas Anderson, another witness, locates the open-ing at the same point, or a little farther from the track. He says that the top of an engine could be seen probably 400 or 500 feet down the track. Charles Anderson, another witness, said that it was a "little open space" just below the curve in the road, and that through this opening a little of the track could be seen. Buffington also testified that the open space was 3 or 4 feet wide, 30 or 40 yards from the crossing, and through which you could see a train coming from the south, and that the track above the whistling board could be seen from this point. However, he also testified that probably a train could be seen 1,000 feet from the crossing above the whistling board.

Alexander Bosco, a farmer and practical surveyor, said that he measured the distance of the open space on the curve of the road; that it was about 30 or 35 yards from the track; that the nearest end of the opening was 30 yards, and the other end 5 yards farther, which would make the opening 5 yards wide. This witness also testified that the opening was probably 8 or 10 feet wide at the point from which one could see the whistling post, and that probably one-half of the whole length of a train could be seen in nearing the post. Witness Young said that the open space was about 120 feet from the river rail, and that you could see a train about two-thirds of the distance between two telegraph poles, but that you could not see it down to the curve in the track, which was shut off by the embankment. Witness Smith said that the opening was 9 or 10 feet wide just at the point where the grade started, and that a train could be seen coming on the track from

that point. Witness Sheets also testified that at 150 feet from the crossing there was an opening of 20 or 30 feet in width, and that one could see a train traveling between the crossing and the whistling post while passing over 30 or 40 feet of the track.

It is but fair to assume that, if the deceased had "raised up" in his wagon at this particular point, he could have seen a considerable portion of the track, and, not having done so, we think his conduct in this respect is a circumstance which the court very properly considered as tending to show that he did not exercise the care and caution a traveler should, in view of the peculiar conditions surrounding the approach to this crossing. After leaving the point referred to as being 150 feet from the crossing, the deceased traveled at a rate of about 2 miles an hour until he reached the crossing, and continued so to travel, according to the evidence, until the horses' feet were in or near the center of the track, when the deceased exclaimed, "My God, there comes the Fast Line!"

The defendant introduced a signed statement given by Anderson to the claim agent, the day after the accident occurred, in which, among other things, he said:

"He (referring to the deceased) never spoke of the train, or apparently made no effort to see if a train was coming."

However, the witness at the trial, in referring to what transpired just before the accident, among other things said:

"Q. After you and Mr. Barton got into this wagon, what did you do then? A. We sat down on an egg case and was talking about his wagon. He said it wasn't fit for the public highway on account of being so low, but was the nicest and handiest thing he ever had on the farm to haul in hay and wheat on. Q. What direction did you go after you got into the wagon? A. Well, we went south. Q. How high was that wagon, if you know—the body—from the ground? A. Well, it was about 37 inches. Q. How was Mr. Dernberger sitting? A. He was sitting on an egg case pretty well front of the wagon. Q. Where were you in reference to the front of the wagon? A. Setting about 2½ feet from the back end on an egg case; Mr. Dernberger and Mr. Barton setting side by side. Q. What, if anything, did you and Mr. Dernberger do between the time you got upon this wagon and the time of the accident? A. Well, we talked about hauling in hay and wheat—how nice the wagon was on the place. Q. Now, go on and tell in reference to looking or not looking for the train. A. We got within about 200 feet of the track when the trace became unhooked, and he stopped and hooked up that trace and then picked up the lines. Q. What, if anything, did you do in reference to looking for the approach of the train?

"Mr. Ambler: Objected to."

Counsel for plaintiff insist that the witness Anderson, among other things, testified that when within 16 feet of the track deceased looked and listened. A careful analysis of the evidence fails to sustain this contention. Anderson was the only witness who testified as to what happened just before and at the time the accident occurred. His testimony bearing on this point is as follows:

"Q. What else did he do at that point? A. Well, we started along and about 150 feet of the track started upgrade.

"Court: About 200 feet of the track you say the traces became unfastened? A. Yes, sir; and about 150 feet of the track started up a little grade to the crossing, and he checked his horses to a slow walk, and looked and listened, but didn't see any train or hear any.

"Court: That was 150 feet, where you went upgrade?  A. Yes, sir.
"Court: And he checked his horses?  A. Yes, sir.
"Court: Checked his horses and went at slow speed?  A. Yes, sir.
"Court: Did or did he not stop at that place?  A. No, sir; he did not stop.
"Mr. Bills: What, if anything, else did Mr. Dernberger do at or near the crossing?  A. Well, that's all he done until we came up on the crossing, and when the horses' front feet came up in the middle of the track, he says, 'My God, there is the Fast Line!' and when he said that I looked, and it looked to me like it was within 15 or 20 feet of us, and I made a jump backwards, and he made an attempt to raise off the egg case, and my opinion is made an attempt to jump to the right.  Q. At what speed was Mr. Dernberger driving his team just before he came to the crossing?  A. Very slow. I don't know how slow, but the horses almost stopped when he checked them and looked and listened for the train.  Q. What, if anything, did he do in the way of looking for the train?  A. Well, we pulled to the right and tried to look down, but couldn't see down the road on account of brush, weeds, and stuff growing up—couldn't see down from the road to the railroad track."

From this testimony it appears that the point at which deceased turned to the right and looked and listened for the train was 150 feet distant from the crossing. It is true that, in response to the question as to what deceased did just before he came to the crossing, witness said, "The horses almost stopped when he checked them and looked and listened for the train;" but in response to the next question witness explains by saying, "We turned to the right and tried to look down, but couldn't see down the road on account of weeds, brush, and stuff growing up—couldn't see down from the road to the railroad track." In response to the second question preceding this question, wherein the witness was asked, "What, if anything, else did Mr. Dernberger do at or near the crossing?" witness said, "Well, that's all he done until we came up on the crossing and when the horses' front feet were in the middle of the track." Witness could not have intended to convey the idea that when they got within 16 feet of the crossing deceased could not see down the road to the railroad track. Therefore we think the proper interpretation to be placed upon this testimony is that they could not see down the road to the railroad track on account of brush, weeds, etc., which obstructed the view at the point about 150 feet from the crossing.

The uncontradicted evidence shows that no signals were given at or near the whistling board. In describing just what happened as the train was in a very short distance of the parties, witness testified as follows:

"Q. What happened after Mr. Dernberger drove upon the crossing?  A. Why, he said. there is the fast train. and made an attempt to jump out of the wagon, and the train struck the wagon as he made the attempt to rise off of the egg case.  *  *  *  Q. How far could you see down the track at the time of this accident, when you were 16 or 18 feet from the track?  A. Well, you could see probably 30 or 40 feet.  Q. What, if anything, prevented you from seeing further than that?  A. Why, there was brush and weeds grown up on the right of way.  Q. As you approached near to the crossing from this point 16 or 18 feet back, what was the condition down the track as to seeing or not seeing?  A. There was an embankment down there, between 12 and 13 feet high, grown up with brush and weeds that hid your view all of the way from that down the track.  Q. Can you state to the court and jury the distance that embankment is or was at that time down the track from the cross-ing?  A. Well, I never measured it, but I judge it is 200 feet.  Q. What is

the condition of the track, the railroad track, on down from the cut there or embankment? A. Well, grown up with brush and weeds. Q. I mean as to being or not being straight track? A. Kind of on a curve. Q. What direction does it curve in reference to the Ohio river? A. Well, it kind of comes up on a curve this way. Q. Curves towards the river or away from the river? A. Yes, sir; curves towards the river. Q. Can you state what the greatest possible distance is that a person could have seen that train down the track approaching from the south at the time of the accident, if he had been on the crossing? A. Well, you could see it down the track, if right on the crossing, 600 or 700 feet. Q. What, if anything, was there to prevent you from seeing a train still further down the track? A. Why it goes behind a big cut there; the curve turns there, and it goes behind this cut and hides your view."

The witness, on cross-examination, among other things, testified as follows:

"Q. How many places from where you stopped there at 200 feet from the crossing were there that you could look through and see the railroad, or cars on the railroad? A. There is one place, I know. Q. Where was that? A. About 150 feet from the railroad crossing. Q. There was one place, haven't you stated, sitting down you couldn't see through? A. Yes, sir; could see through by raising up in the wagon; could see down probably two rail lengths. Q. And you didn't raise up? A. No, sir. Q. And Mr. Dernberger didn't raise up? A. No, sir. Q. And Mr. Barton didn't raise up? A. No, sir. Q. Were not you gentlemen teasing Mr. Dernberger about the little wagon, or he talking to you about that, about that time? A. No, sir. Q. What did he say about what his wagon could do? A. He was talking, when we first got in the wagon, how handy and nice it was on the place to haul in wheat and hay with; that he could drive it over rough ground and wouldn't upset. Q. Didn't he say it wasn't fit for a road wagon? A. He said it wasn't fit for the roads. Q. Don't you remember you were talking with him up until you got to the railroad track? A. No, sir. Q. What were you doing as you got there towards the track? Witness: Sir?

"Mr. Ambler: What were you doing—you three men—as you got up towards the track? A. We were setting on egg cases, and I had raised up about halfway maybe before, and put my hand on the wagon bed to get off at the crossing. Q. Why? A. I always get off there to go to my home. Q. Where was your home in reference to the railroad track? A. About three-quarters of a mile below Cove Run Crossing. Q. And you were going to get off at Cove Run Crossing and walk down the railroad track? A. No, sir; I walk along the public road. * * * Q. What was the first thing that anybody said about the train as you went along up there? A. Mr. Dernberger was the first man that spoke about the train. When his horses' front feet were in the middle of the track he saw the train and said, 'My God, there is the fast train now!' Q. Where were you? A. I was standing in the wagon bed. Q. Standing up? A. Yes, sir. Q. How far was the train from you then, coming from the south? A. It looked like it was within 15 or 20 feet of me. Q. What did you do? A. I immediately jumped to escape, and as I made the jump she picked up the wagon. Q. Did you notice the horses' feet, and notice where the train was when you made your jump? A. When he first spoke, the horses' front feet were in the middle of the track; but before I made the jump they had jerked the wagon onto the middle of the track. * * * Q. How long, to your knowledge, had Mr. Dernberger been in the habit of going across there at that crossing? * * * A. All his life, I reckon, so far as I know. Q. Well, how many years had you known of him being in the habit of going across there? A. The last 27 or 28 years. * * * Q. Haven't you worked along there in years gone by yourself? A. Yes, sir. Q. Well, now, I believe you testified after you left that point about 150 feet back you didn't stop at all? A. No, sir; he checked his horses to a very slow walk, almost to a standstill. Q. And kept coming on? A. Yes, sir. * * * Q. Do you remember Mr. Dernberger telling you about the age of his horses? A. Yes, sir. Q. What did he say? A. Four years old. Q. And they acted like it, didn't they? A. They acted like any other horses. Q. Pretty

lively horses? Now, how much of a space did you say there was between the line of the right of way and the rail in which you could look south, down the track? A. Why, there wasn't any you could see until within 16 feet of the track. Q. Very well. When you got within 16 feet of the track, how far could you look south? A. About 30 or 40 yards. Q. If you said feet before, do you mean yards now? Which do you mean? A. If I said feet, I mean yards. * * * Q. Now, how many places did you say you stopped after you got in the wagon before you got on the track? A. Only one place. Q. Where was that? A. About 200 feet from the crossing. Q. And that was to hitch up a trace, wasn't it? A. Yes, sir. Q. Now, to get it right, where was that you could have looked through some place if you had raised up in the wagon? A. About 150 feet from the crossing. Q. But you didn't stop there? A. No, sir. Q. Did you stop any more until the engine struck the wagon? A. No, sir."

Witness also testified as follows in regard to the statement that he had given the claim agent:

"Q. I hand this paper to you, and ask you if this paper, three pages, two sheets, with your name on it, isn't the paper you signed there? A. A page and a half is what I signed. Q. Was that name signed there signed by you? A. Yes, sir. Q. And it was signed on that paper, wasn't it? A. A page and a half I signed; yes, sir. I cannot say whether that is the paper or not. Q. I believe you do not read or write, except your name? A. No, sir; I cannot read, but I can write my own name."

An examination of the testimony of this witness shows that he testified at three different times that the deceased, just before the train came upon him, attempted to rise up and jump. After all the evidence offered by the plaintiff had been submitted to the jury, plaintiff announced that she rested her case, and defendant moved the court to direct a verdict, upon the ground that the evidence was insufficient to entitle plaintiff to a judgment. The court took the case under advisement until the next morning, when counsel for plaintiff asked permission to recall the witness Anderson and interrogate him further before the jury touching newly discovered evidence. The witness, when asked as to what the deceased was doing in regard to the team he was driving when he reached the point where a train approaching could be seen, said:

"It looked to me like he was holding them with all the strength he had to bring them to a stop."

And, when asked as to what the team did, witness said:

"Well, they just stopped about on the track, maybe was in the middle of the track and made a lunge at the time it seen the train and jerked the wagon upon the track."

On cross-examination witness was asked if he had not theretofore testified that he could not make out whether the deceased was trying to rush his horses or draw them back, and said:

"Why, he made an attempt to hit the horses or check them, or raised to jump from the wagon; I couldn't say."

Witness was further interrogated as to whether he had not already testified that, when deceased got up, he (witness) thought it was with the intention of making a jump. In response to this question witness said:

"I said 'in my opinion.' I didn't know which he intended to do."

While it was obviously the purpose of the plaintiff to show by this witness, when recalled, that the horses became unmanageable and the deceased did everything in his power to keep them from going upon the track, the mere reading of witness' testimony as to this point is sufficient to show that no such inference could be drawn therefrom. Further, this testimony is highly inconsistent with the statements made by witness when he was first on the witness stand. Indeed, his own admission shows that he was not willing to testify affirmatively to the state of facts sought to be established.

As we have already stated, the defendant by leave of the court introduced two witnesses out of order. At that time counsel no doubt felt that the case might go to the jury; but when they decided to request the court to direct a verdict the testimony of these two witnesses was excluded, or rather not considered; the court saying, among other things:

"And the court further certifies that, in determining the motion to direct a verdict, the evidence of these two witnesses was totally disregarded by it."

Therefore the court below, in disposing of the defendant's motion, based its judgment upon the uncontradicted evidence offered by the plaintiff.

The daughter of the deceased was introduced as a witness, and among other things testified that the train which killed her father was 10 minutes late. This evidence at most was conjectural; she not having a time-table with which to verify her opinion in regard to the matter. In view of the peculiar circumstances surrounding this case, we fail to see how evidence of this character could be material in determining the question at issue. The deceased, in attempting to go upon the crossing, evidently knew about the "Fast Line," and he also must have known as a matter of common knowledge that railroads operate special trains, and that frequently trains are not run on time. New York, P. & N. R. Co. v. Kellam's Adm'r, 83 Va. 851, 3 S. E. 703.

A number of other witnesses were introduced, most of whom testified as to the condition of the approach to the crossing; others, that no signal was given by the defendant; and some as to the amount of damages which plaintiff would be entitled to recover, in the event the court should hold that she had established a good cause of action. The real question presented to this court is as to whether, under all the circumstances, the deceased exercised ordinary care from the time he left the point 150 feet distant from the crossing until he first saw the train approaching.

[5] While Anderson, as we have said, testified that deceased "looked and listened" at a point 150 feet from the crossing, no other inference can be drawn from his testimony than that after leaving this point he drove slowly, going at about the rate of 2 miles an hour, and that after he came to within 16 feet of the track, where witness said he could have seen 30 or 40 yards south of the crossing if he had looked, deceased drove his team onto the crossing, apparently oblivious to the fact that he might encounter the train in so doing. If he had only looked or listened, or even hesitated, when he came within 16 feet of the track, he could have saved his life and that of the other unfortunate

man who was riding with him. Bearing upon this point the court below, in referring to the facts, said:

"Anderson testified that they were driving at a rapid rate until they reached 150 feet of the track, when they did not stop, but slowed down to a speed of 2 miles per hour. It was proved beyond all doubt that the view of the track was obstructed. Anderson stated that, at a point about 16 feet before reaching it, the track could be seen for a distance of 30 or 40 rods; he subsequently corrected this statement and said for a distance of 30 or 40 yards. Young testified that from that point—16 feet before the team reached it—the track could be seen 360 feet. Recalling the fact that 5,280 feet constitute a mile, 10,560 feet 2 miles, it is mathematically sure that Dernberger, driving at a speed of 2 miles per hour, would go 176 feet a minute, or $2^{14}/_{15}$ feet per second. He therefore drove this 16 feet from where he could see the track in a little over 5 seconds; had he stopped the noise of his wagon at that point for these few seconds, so as to be able to look and listen effectively, he would have saved his life. Nay, more, admitting that the train was running 45 miles an hour, it was then covering 237,600 feet an hour, 3,860 feet a minute, 66 feet a second. If Dernberger had stopped at the point 16 feet before reaching the crossing, where he could see the track for a distance of 150 to 200 feet according to Anderson, 360 feet according to Young, for two seconds, the train would have beat him to the crossing. Such mathematical demonstrations must startle us into a realization of how necessary it was for Dernberger to have obeyed the legal obligation to stop, look, and listen."

[6] Among other things, it was shown that the defendant failed to give a signal in approaching the crossing, either by ringing the bell or blowing the whistle, and, as we have stated, the plaintiff insists that the failure of the defendant to give the signal as required by the statutes of West Virginia was the proximate cause of the injury of plaintiff's intestate. In other words, that if the defendant had given this warning the accident would not have happened. The Supreme Court of the United States in the case of Railroad Company v. Houston, 95 U. S. 697, 24 L. Ed. 542, in discussing this question passed upon this point; the first syllabus in that case being in the following language:

"The neglect of the engineer of a locomotive of a railroad train to sound its whistle or ring its bell on nearing a street crossing does not relieve a traveler on the street from the necessity of taking ordinary precautions for his safety. Before attempting to cross the railroad track, he is bound to use his senses—to listen and to look—in order to avoid any possible accident from an approaching train. If he omits to use them, and walks thoughtlessly upon the track, or if, using them, he sees the train coming, and, instead of waiting for it to pass, undertakes to cross the track, and in either case receives any injury, he so far contributes to it as to deprive him of any right to complain. If one chooses in such a position to take risks, he must suffer the consequences. They cannot be visited upon the railroad company."

In the case of R. A. Abernathy, Administrator, v. Southern Railway Company, 164 N. C. 91, 80 S. E. 421, and in Cork Treadwell, Administrator of Henderson Treadwell, deceased, v. The Atlantic Coast Line Railroad Company, 169 N. C. 694, 86 S. E. 617, the case of Railroad Company v. Houston, supra, is cited with approval.

In the case of Neininger v. Cowan, supra, 101 Fed. 787, 42 C. C. A. 20, this court in passing upon the case, the facts of which are somewhat analogous to the case at bar, speaking through Judge Simonton, said:

"There can be no doubt, from the testimony presented at the trial, that the defendants were guilty of negligence. The train approached a crossing of two

important streets in the city, and gave no notice whatever of its coming. The witnesses heard no bell, and no whistle was sounded. No gates had been erected at the crossing, and no person was stationed at that place to give notice of a moving train. The defendants had neglected to observe the regulations prescribed both by an act of the Legislature and by the ordinances of the city. So it must be assumed that at the time of the accident, and as one cause of the accident, there was negligence on the part of the defendants. But this does not decide the case. 'The question in such cases' as this at bar 'is (1) whether the damage was occasioned entirely by the negligence or improper conduct of the defendant; or (2) whether the plaintiff himself so far contributed to the misfortune by his own negligence or want of ordinary care and caution that, but for such negligence or want of care and caution on his part, the misfortune would not have happened.' Railroad Co. v. Jones, 95 U. S. 442, 24 L. Ed. 507; Railway Co. v. Ives, 144 U. S. 424, 12 Sup. Ct. 679, 36 L. Ed. 485."

Judge Simonton in referring to the case of Missouri Pacific R. Co. v. Moseley, 57 Fed. 922, 6 C. C. A. 642, also said:

"It goes without saying that injury from engines or cars can be and ought to be foreseen or anticipated as the probable result of walking across or on a railroad track without looking both ways and listening for approaching engines. This is demonstrated by the fact that so universal is the experience that it has become a settled rule of law that such action is negligence. Railway v. Moseley, supra; Elliott v. Railway, 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068. The negligence of the servants of a railroad company in not sounding a whistle or ringing a bell does not excuse a person for not exercising ordinary care in crossing a track. Railroad Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542."

Also the case of Wright v. Southern Railroad Co., 155 N. C. 325, 71 S. E. 306, extends the doctrine almost beyond the rule announced by the Supreme Court of the United States. In that case the plaintiff, who testified in his own behalf, said that:

"On September 6, 1909, he was going toward Canton, and had just passed a little branch, and a freight train hove in sight coming from Canton; that he drove on, his mare in a slow trot, kind of cantering along; he did not see anything to stop for, as the train had just passed. He thought everything was clear, and when he got to the railroad crossing, Hall, the man in the buggy with him, said, 'There is another train coming up there,' and plaintiff said, 'It is that train down there,' and Hall jumped out of the buggy right at the track and said, 'Whip up your mare, or you will be caught,' and plaintiff turned his head and looked up the track, and the train was about 40 or 60 feet from him, coming backwards down the track, and he struck his mare, and the smoke and steam coming out scared the mare, and she threw him against the sign post and injured him."

The Supreme Court of North Carolina in that case, among other things, said:

"But we must recognize the principle, firmly established, that the judge must decide, as a matter of law, the preliminary question whether there is any legal evidence to be submitted to the jury."

After stating that caution should be observed, and the construction of the evidence most favorable to the plaintiff adopted, the court said:

"Considering the evidence in this light, we must sustain the ruling of the judge, as it appears clear to us that the plaintiff was guilty of contributory negligence on his own evidence."

Indeed, this rule is so well settled that we do not deem it necessary to prolong the discussion on this point, further than to say that the cases

of Southern Ry. Co. v. Carroll, 138 Fed. 638, 71 C. C. A. 88, and Chicago, St. P., M. & O. R. Co. v. Rossow, 117 Fed. 491, 54 C. C. A. 313, are directly in point and sustain the contention of the defendant. It will be noted that the case of Missouri Pacific Railroad Co. v. Moseley, supra, and also the case of Railroad Company v. Houston, supra, the latter being the leading case by the Supreme Court on this point, are to the same effect.

In the case of Northern Pacific Railroad Company v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014, the Supreme Court, through Mr. Justice Brown, who delivered the opinion of the court, said:

"So far, then, as there was any oral testimony upon the subject, it tended to show that the deceased neither stopped, looked, nor listened before crossing the track, and there was nothing to contradict it. Assuming, however, that these witnesses, though uncontradicted, might have been mistaken, and that the jury were at liberty to disregard their testimony, and to find that he did comply with the law in this particular, we are confronted by a still more serious difficulty in the fact that, if he had looked and listened, he would certainly have seen the engine in time to stop and avoid a collision. He was a young man. His eyesight and hearing were perfectly good. He was acquainted with the crossing, with the general character of the country, and with the depth of the excavation made by the highway and the railway. The testimony is practically uncontradicted that for a distance of 40 feet from the railway track he could have seen the train approaching at a distance of about 300 feet, and, as the train was a freight train, going at a speed not exceeding 20 miles an hour, he would have had no difficulty in avoiding it. * * * If, in this case, we were to discard the evidence of the three witnesses entirely, there would still remain the facts that the deceased approached a railway crossing well known to him; that the train was in full view; that, if he had used his senses, he could not have failed to see it; and that, notwithstanding this, the accident occurred. Judging from the common experience of men, there can be but one plausible solution of the problem how the collision occurred. He did not look; or, if he looked, he did not heed the warning, and took the chance of crossing the track before the train could reach him. In either case he was clearly guilty of contributory negligence."

However, counsel for plaintiff insists that the evidence shows that deceased continued to look and listen up to the very moment that he was struck by the train. As we have stated, we do not think that there is any evidence to sustain this contention; but, even if there had been testimony that deceased was looking and listening the circumstances surrounding this occurrence are such as to render the truthfulness of such evidence highly improbable. Judge Van Devanter in the case of Chicago & N. W. Ry. Co. v. Andrews, 130 Fed. 65, 64 C. C. A. 399, in an opinion rendered by the Circuit Court of Appeals for the Eighth Circuit, said:

"Common knowledge tells us that in the presence of a strong wind blowing across the track the train could not have been entirely or largely obscured by smoke issuing from a small smokestack 25 feet in the air and only 18 feet from the track. The action of the wind would necessarily dissipate the smoke, and prevent it from falling to the ground in large volume so near the stack from which it was being discharged. If plaintiff had looked with any care, he would have seen the train. It was there. His presence upon the track and the collision were practically simultaneous. His mistake is disclosed by his own testimony, wherein he admits his controlling anxiety to cross in advance of the freight train, and says: 'I placed my eyes on this freight train, and advanced [two steps], * * * and saw this [passenger] train.' He actually stepped immediately in front of the moving train. If plaintiff had listened at-

tentively, he would also have heard the approaching train before he took the two unfortunate steps. Common knowledge tells us that a train of cars drawn over a railroad track by a 90-ton engine at a rate of 50 miles an hour makes a great noise, and that even a strong wind, not of extraordinary or unusual velocity or force, does not render it possible for such a train to come unexpectedly upon one who possesses a good sense of hearing and is reasonably employing it for his protection under circumstances which otherwise permit its free use. That plaintiff, in possession of good sight and hearing, could have looked and listened, and not have seen or heard the train, which must have been in plain view, and making a great noise, is contrary to all reasonable probability, in opposition to the physical facts, and impossible of belief. In these circumstances his testimony that he looked and listened is entitled to no credence, and does not create a conflict in the evidence."

The following cases are to the same effect: William Holden v. Pennsylvania Railroad, 169 Pa. 1, 32 Atl. 103; Eliza Coppuck v. Philadelphia, Wilmington & Baltimore Railroad Company, 191 Pa. 172, 43 Atl. 70; Virginia & S. W. Ry. Co. v. Skinner, 119 Va. 843, 89 S. E. 887.

As we have said, it is earnestly insisted by counsel for plaintiff that the case of Continental Improvement Co. v. Stead, supra, 95 U. S. 161, 24 L. Ed. 403, is on "all fours" with the case at bar, and therefore binding on this court. A careful consideration of this case, in view of the rulings of the Supreme Court since the judgment therein was rendered we think justifies us in saying that a proper interpretation of all the Supreme Court had to say at that time shows that it was not intended to in any wise modify the rule as announced in the cases of Railroad Co. v. Houston, supra, Railroad Co. v. Jones, supra, and Railroad Co. v. Freeman, supra. There the—

"plaintiff was going east, away from the village, following another wagon, and in approaching the railroad track could not see a train coming from the north, by reason of the cut and intervening obstructions. There was no evidence tending to show that the plaintiff, though he looked to the southward (from which direction the next regular train was to come), did not look northwardly; that his wagon produced much noise as it moved over the frozen ground; that his hearing was somewhat impaired, and that he did not stop before attempting to cross the track; also, evidence tending to show that the engineer in charge of the train used all efforts in his power to stop it after he saw the plaintiff's wagon on the track. The evidence was conflicting as to whether the customary and proper signals were given by those in charge of the locomotive, and as to the rate of speed the train was running at the time; some witnesses testifying that it was at an unusual and improper rate, and others to the contrary."

There no motion was made to direct a verdict for the defendant. However, exceptions were taken to the refusal of the court below to adopt certain instructions presented by counsel for defendant. In referring to the questions sought to be reviewed Mr. Justice Bradley said:

"The present writ of error is brought to review the instructions given by the court to the jury on the trial."

The first and second paragraphs of the syllabus are in the following language:

"1. Travelers upon a common highway which crosses a railroad upon the same level, and the railroad company running a train, have mutual and reciprocal duties and obligations; and, although the train has the right of

way, the same degree of care and diligence in avoiding a collision is required from each of them.

"2. That right does not, therefore, impose upon such a traveler the whole duty of avoiding a collision, but is accompanied with and conditioned upon the duty of the train to give due and timely warning of its approach."

The court, after announcing the rule as epitomized in the syllabus from which we have quoted, among other things, said:

"On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed, without evidence, that they do not exercise proper care in a particular case. But, notwithstanding the hazard, the infirmity of the human mind in ordinary men is such that they often do manifest a degree of negligence and temerity entirely inconsistent with the care and prudence which is required of them—such, namely, as an ordinarily prudent man would exercise under the circumstances. When such is the case, they cannot obtain reparation for their injuries, even though the railroad company be in fault. They are the authors of their own misfortune."

In this connection it should be remembered that the cases of Railroad Co. v. Houston, supra, and Railroad Company v. Jones, supra, are reported in the same volume and were decided at the same term at which the Stead Case was decided. Therefore, that the court must have had the Stead Case in mind at the time the opinions in the other two cases were rendered. There being, as we have stated, no motion to direct a verdict in the Stead Case, the real question presented in this case, where the facts are different from that case, was not passed upon by the Supreme Court at that time.

In the case of Schofield v. Chicago, Milwaukee & St. Paul Railway Company, supra, 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224, the Supreme Court also applied the doctrine announced in the Houston Case. There the court below directed a verdict in favor of the defendant upon the ground that the plaintiff by his own showing was guilty of negligence, whatever the negligence may have been on the part of the defendant; the court, among other things, saying:

"Applying the test that, if it would be the duty of the court, on the plaintiff's evidence, to set aside, as contrary to the evidence, a verdict for the defendant, if given, the court had authority to direct a verdict for the defendant, it considered the case under the rules laid down in Continental Improvement Co. v. Stead, 95 U. S. 161 [24 L. Ed. 403], and especially in Railroad Co. v. Houston, 95 U. S. 697 [24 L. Ed. 542], and arrived at the conclusions of law, that neither the fact that the train was not a regular one, nor the fact of its high rate of speed, excused the plaintiff from the duty of looking out for a train; that the fact that it did not stop at the depot could avail the plaintiff only on the view that, hearing a whistle from it, as it was south of the depot, he supposed it would stop there, and so failed to look, but that, in such case, he would have been negligent, because it was not certain the train would stop at the depot, and he would have had warning that a train was approaching; that the neglect of the train to blow a whistle or ring a bell between the depot and the crossing did not relieve the plaintiff from the duty of looking back, at least as far as the depot, before going on the track; and that, in view of the duty incumbent on the plaintiff to look for a coming train before going so near to the track as to be unable to prevent a collision, and of the fact that he was at least 100 feet from the crossing when the train passed the depot, and could then have seen it, if he had look-

ed, and have avoided the accident by stopping until it had passed by, he was negligent in not looking."

The plaintiff, as we have stated, cites the case of Grand Trunk Railway Company v. Ives, supra, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, in support of its contention. The Supreme Court in that case, among other things, says:

"Nothing was said by this court in Railroad v. Houston, 95 U. S. 697 [24 L. Ed. 542], or in Schofield v. Chicago & St. Paul Railway, 114 U. S. 615 [5 Sup. Ct. 1125, 29 L. Ed. 224], which are relied upon by the defendant, that in any wise conflicts with the instructions of the court below in this case, or lays down any different doctrine with respect to contributory negligence. Delaware Railroad v. Converse, 139 U. S. 469 [11 Sup. Ct. 569, 35 L. Ed. 213]."

In the case of Delaware, etc., Railroad Co. v. Converse, 139 U. S. 474, 11 Sup. Ct. 569, 35 L. Ed. 213, it being shown that there was a severing of a train of cars on a railroad track at nighttime, leaving a part uncontrolled, except by ordinary brakes, to run across a public highway at a grade, without warning by either flagman, bell, whistle, or some other effective means that they were approaching, was this evidence of an utter disregard of persons using the highway, such as to justify the court in saying as a matter of law that it constituted negligence on the part of the railroad company for which plaintiff could recover unless he had been guilty of contributory negligence? The Supreme Court in that case cites with approval the cases of Railroad Co. v. Houston, supra, and Railroad Co. v. Jones, supra. Instead of modifying the doctrine announced in these cases, the court reaffirmed the same, quoting that portion of the Jones Case wherein the court said:

"The plaintiff himself so far contributed to the misfortune, by his own negligence or want of ordinary care and caution, that but for such negligence or want of care and caution on his part the misfortune would not have happened."

The Houston Case has often been quoted, it appearing, as shown by "Shepherd's United States Citations," to have been cited 7 times by the Supreme Court and 71 times in the Federal Reporter. While in the Schofield Case the court refers to the Stead Case as well as the Houston Case, it prefers the Houston Case, and cites with approval that portion of the Houston Case wherein it was held that the failure of the engineer to sound a whistle or ring a bell did not release the deceased from taking ordinary precautions for her safety.

Counsel for plaintiff further contend that the facts in the case of Sealey v. Southern Ry. Co., 151 Fed. 736, 81 C. C. A. 282, decided by this court, are analogous to those of the case at bar, and therefore that the same is an "authority on all fours, binding here." The facts of that case are wholly different from the case at bar. In order to show this, we need only quote that portion of the opinion wherein the court says:

"He looked in going down the steps, within a few feet of the track of the defendant company, and, after getting down, again looked for the approach of trains, and, none being in sight, proceeded on his way over the company's tracks to his place of business. * * * After he had looked the second time, he walked a distance of 30 feet along the track, then stepped upon it, without at the moment looking back. It is not clear from the evidence that he thus stepped upon the track, or when he did so after looking; but, assuming that he did walk the 30 feet after looking, he had only a moment before looked

back, where he could see a distance of 300 yards, and he should not, therefore, be held conclusively disentitled to recover, because of his failure again to look, especially as he was observing the movements of a shifting engine in front of which he had to pass."

The foregoing, we think, disposes of plaintiff's contention as respects that case.

[7] From what we have said we are of opinion that the rule announced in the Houston Case, as well as the Neininger Case, is controlling, and should be followed by this court. When we apply that rule to the facts in the case at bar, we cannot escape the conclusion that, had it not been for the negligence of the plaintiff's intestate at and just before the time he reached the crossing, the accident would not have happened. The testimony of the various witnesses as to the intervening space between the obstructions to which we have referred and the crossing, and the distance one could have seen along the track in the direction from whence the train came, we think, was sufficient to establish the fact that, if the plaintiff had looked and listened at that point before going upon the crossing, he could have seen or heard the approaching train in ample time to avoid the accident.

Counsel for plaintiff also contend that, notwithstanding the Neininger Case, this court should follow the decisions of the highest court of the state in actions at law, except in cases of grave and palpable error, as to general commercial law and general jurisprudence, and cite in support of this contention the case of Sim v. Edenborn, 242 U. S. 131, 37 Sup. Ct. 36, 61 L. Ed. 199, wherein the court, among other things, said:

"This court has many times considered how far federal tribunals, when undertaking to enforce laws of the states, should follow opinions of their courts. The authorities were reviewed and rule announced in Burgess v. Seligman, 107 U. S. 20, 33, 34, 35 [2 Sup. Ct. 10, 27 L. Ed. 359], which declared that, as to doctrines of commercial law and general jurisprudence, the former exercise their own judgment; 'but even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts, if the question seems to them balanced with doubt.' * * * The conclusions of the Court of Appeals in Heckscher's Case [203 N. Y. 210, 96 N. E. 441], are not in direct conflict with any declared views of this court, and some expressions in our former opinions tend to support them."

Counsel insist that the decisions of the Supreme Court of West Virginia are to the effect that the question as to whether one has been negligent in failing to stop, look, and listen "is generally presented as a mixed question of law and fact to be submitted to the jury. * * *" In support of this contention the case of City of Elkins v. Western Maryland R. Co. (W. Va.) 86 S. E. 763, is cited. The court in that case, among other things, said:

"The sole question presented for our decision is whether, under all the facts and circumstances attending them at the time, plaintiff's servants were guilty per se, and as matter of law, of contributory negligence in not stopping before going upon the track. * * * We do not think the court was justified in holding in this case that plaintiff's servants were guilty per se of contributory negligence."

In the above case it was held that it was not negligence per se in all cases for a traveler upon a public street or road, in approaching a rail-

road, not to stop, as well as to look and listen, before attempting to go upon the track. On the other hand, it was held that, when a question arises as to whether the party attempting to cross had failed to stop, then an issue is raised as to a mixed question of law and fact, and therefore should be submitted to the jury. In that case it was also conceded that in cases of peculiar circumstances, where the facts are such that no two men could differ, it would then become the duty of the court, as a matter of law, to determine upon all the facts as to whether the negligence of the plaintiff was the proximate cause of his injury. There the court sought to distinguish between Beyel v. Newport News & M. V. R. Co., 34 W. Va. 538, 12 S. E. 532, on the ground that in the latter case it was shown that the plaintiff neither stopped, looked, nor listened where he could have heard a signal from an approaching train, and that being behind a wall running almost down to the railroad, which obscured his vision, and to a considerable extent his hearing, until he had reached a point within a very short distance of the track, and at a time when he knew that a train was about due. When we apply the rule announced in the City of Elkins Case to the facts as established in this case, we find nothing therein in conflict with what we conceive to be the universal rule where one, in utter disregard of surrounding dangers, neither listens nor looks before placing himself in a position of imminent peril.

It is well settled that, where a rule has been established by the federal courts anterior to a decision by the state courts, or where, on the other hand, the cause of action accrued after a change of decision in the state courts, the federal courts will abide their own decisions, or follow the decision of the state court at the time the cause of action accrued. It appears from the evidence that the plaintiff's cause of action accrued on the 25th day of July, 1915, and the Supreme Court of West Virginia rendered its decision in the case of City of Elkins v. Western Maryland Railroad Company, supra, on the 12th day of October, 1915. It is urged by counsel for plaintiff that Neininger v. Cowan, supra, was decided in view of the rule announced in Beyel v. Newport News & M. V. R. Co., supra, and Berkeley v. Chesapeake & O. R. Co., 43 W. Va. 11, 26 S. E. 349, and that the local law of that state is now expressed in the City of Elkins Case, which practically overrules the two last-named cases, and should, therefore, be adopted by this court.

[8, 9] We cannot concur in this suggestion for two reasons: (a) If the decision in the City of Elkins Case overrules the decisions of that court, this court would not be bound by such decision as to a cause of action which accrued prior to the date of its rendition; and (b) if the cases which counsel contend have been overruled did not establish the law of that state, then this court would not be required to alter its judgment in the case of Neininger v. Cowan, supra, simply because the state court had changed its view of the law. In other words, this court, in the absence of a well-established rule by the state court of West Virginia, was warranted in forming its independent judgment on the subject, and, in any event, it is not disposed to change its judgment, so as to meet the views of the later decisions in a cause of action like the one at bar, where rights and liabilities have arisen before the last-nam-

ed decision by the Supreme Court of the state. Stanley Co. Commissioners v. Coler, 190 U. S. 437, 23 Sup. Ct. 811, 47 L. Ed. 1126; Kuhn v. Fairmont Coal Company, 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228. In the latter case the Supreme Court said:

"We take it, then, that it is no longer to be questioned that the federal courts in determining cases before them are to be guided by the following rules: (1) When administering state laws, and determining rights accruing under those laws, the jurisdiction of the federal court is an independent one, not subordinate to, but co-ordinate and concurrent, with the jurisdiction of the state courts. (2) Where, before the rights of the parties accrued, certain rules relating to real estate have been so established by state decisions as to become rules of property and action in the state, those rules are accepted by the federal court as authoritative declarations of the law of the state. (3) But, where the law of the state has not been thus settled, it is not only the right but the duty of the federal court to exercise its own judgment, as it also always does when the case before it depends upon the doctrines of commercial law and general jurisprudence. (4) So, when contracts and transactions are entered into and rights have accrued under a particular state of the local decisions, or when there has been no decision by the state court on the particular question involved, then the federal courts properly claim the right to give effect to their own judgment as to what is the law of the state applicable to the case, even where a different view has been expressed by the state court after the rights of parties accrued. But even in such cases, for the sake of comity and to avoid confusion, the federal court should always lean to an agreement with the state court, if the question is balanced with doubt."

Being of opinion that the other assignments of error are without merit, we do not deem it necessary to discuss the same.

[10] No hard and fast rule as to the duty of a traveler on the highway to stop, look, and listen before crossing a railroad can be laid down. Under some circumstances the railroad company may so act as to allay the sense of danger and relieve the traveler from the obligation to stop, look, and listen. A plain view of the track may make it no breach of duty for him not to stop or listen. He may be traveling on foot or so silently that he can listen as well going as stopping. The obstruction of the view may be such that he is obliged to depend upon his hearing without the aid of his sight. We, therefore, do not lay down the inflexible rule that a traveler must stop, look, and listen under all circumstances. All that we decide in this case is that the evidence excludes any other reasonable conclusion, and that the decedent did not exercise the care in going on the track that a reasonable man would take for his own protection, and therefore the plaintiff cannot recover.

The facts of this case, when considered from any viewpoint, are such as to impel us to the conclusion that the negligent conduct of plaintiff's intestate was the proximate cause of his injury. Such being the case, we are of opinion that the action of the lower court in directing a verdict in favor of defendant was eminently proper.

For the reasons stated, the judgment of the lower court is affirmed.